637 F.2d 1014
 25 Fair Empl.Prac.Cas. 120,
25 Empl. Prac. Dec. P 31,611
Barbara PHILLIPS, Cornell Green Rice, Melvin Phillips, and
Mississippi Council on Human Relations, a
corporation, individually and on behalf
of all others similarly
situated,
Plaintiffs-
Appellants,
v.
The JOINT LEGISLATIVE COMMITTEE ON PERFORMANCE AND
EXPENDITURE REVIEW OF the STATE OF MISSISSIPPI et
al., Defendants-Appellees.
The MISSISSIPPI COUNCIL ON HUMAN RELATIONS, a corporation,
Barbara Phillips, Melvin Phillips and Cornell
Green Rice, individually and on behalf
of all others similarly
situated,
Plaintiffs-
Appellants,
v.
The BOARD OF TRUSTEES OF the INSTITUTION OF HIGHER EDUCATION
a/k/a The State College Board et al.,
Defendants-Appellees.
Barbara PHILLIPS, Melvin Phillips and Cornell Green Rice,
individually and on behalf of a class, Plaintiffs-Appellants,
v.
The STATE OF MISSISSIPPI AGRICULTURAL AND INDUSTRIAL BOARD
et al., Defendants-Appellees.
 Nos. 79-2131, 79-2940 and 79-3550.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit A
 Feb. 23, 1981.
Rehearing Denied April 27, 1981.
 Frank R. Parker, Nausead Stewart, Jackson, Miss., for plaintiffs-appellants Barbara Phillips et al. in No. 79-2131.
 Stewart & Parker, Nausead Stewart, Lawyers' Committee for Civil Rights Under Law, Jackson, Miss., McTeer, Walls, Bailey & Buck, Charles Victor McTeer, Greenville, Miss., for plaintiffs-appellants Miss. Council on Human Relations et al.
 Ross, Hardies, O'Keefe, Babcock & Parsons, William Freivogel, Susan G. Lichtenfeld, Chicago, Ill., Nausead Stewart, Lawyers' Committee for Civil Rights Under Law, Jackson, Miss., for plaintiffs-appellants Barbara Phillips et al. in No. 79-3550.
 James M. Ward, Sp. Counsel, Starkville, Miss., Hubbard T. Saunders, IV, Sp. Asst. Atty. Gen., A. F. Summer, Atty. Gen., State of Miss., Dept. of Justice, Jackson, Miss., for defendants-appellees Joint Leg. Committee et al.
 Ed. Davis Noble, Jr., Asst. Atty. Gen., Bill Allain, Atty. Gen., Jackson, Miss., M. M. Roberts, Hattiesburg, Miss., for defendants-appellees Bd. of Trustees of Institution of Higher Ed. et al.
 Bill Allain, Atty. Gen., Hubbard T. Saunders, IV, Sp. Asst. Atty. Gen., Jackson, Miss., James M. Ward, Sp. Counsel, Starkville, Miss., for defendants-appellees State of Miss. Agricultural and Indus. Bd. et al.
 Appeals from the United States District Court for the Southern District of Mississippi.
 Before WISDOM, RUBIN and SAM D. JOHNSON, Circuit Judges.
 WISDOM, Circuit Judge:
 
 
 1
 These appeals concern three allied lawsuits brought against Mississippi state agencies for employment discrimination. The named plaintiffs are the same in the three cases: Barbara Phillips, Melvin Phillips (not related), and Cornell Green Rice.[1] All are black. In each case the plaintiffs sought to represent a class of black job applicants.
 
 
 2
 The defendant[2] in No. 79-2940 is the Joint Legislative Committee on Performance Evaluation and Expenditure Review ("PEER"), an arm of the Mississippi legislature with power to conduct performance evaluations, investigations, and critical examinations of all expenditures by any state agency. It is composed of five members of each House. It employs a staff of about twenty research analysts and clerical workers. Its offices are in Jackson.
 
 
 3
 The defendant in No. 79-2131 is the Mississippi Agricultural and Industrial Board ("A&I"), an agency created to promote industrial and agricultural development and tourism. Its members are the Governor, the Lieutenant Governor, the Speaker of the Mississippi House, four state legislators, three other state officials, and twenty-five public members appointed by the Governor. Among its functions are approval of industrial bond issues, study and recommendation of tax exemptions for Mississippi ports and harbors, and dissemination of tourist information. The Board employs a staff of sixty to eighty persons at its main office in Jackson.
 
 
 4
 The defendant in No. 79-3550 is the Board of Trustees of the Institutions of Higher Learning (commonly known as the College Board), the governing body for Mississippi's state universities and colleges. Its members are appointed by the Governor. The Board employs a staff of about eighteen financial analysts and clerical workers in Jackson. This suit concerns the Board's employment practices with regard only to that staff and not to the university system generally.
 
 
 5
 All three suits were brought as class actions in the Northern District of Mississippi, alleging racial discrimination in the defendants' employment practices in violation of Title VII of the Civil Rights Act of 1964 as amended.[3] The cases were transferred to the Southern District of Mississippi under 28 U.S.C. § 1404(a) (1976). Although the PEER and A&I cases were consolidated for some preliminary purposes, the three were tried separately.[4] In the PEER and A&I cases the plaintiffs moved for the district judge's recusal. The motions were denied, and this Court refused to issue a mandamus ordering recusal of the trial judge. In re Phillips, No. 76-4038 (5 Cir. Nov. 19, 1976). In the PEER and College Board cases, the court refused to certify the alleged classes. In the A&I case the court certified a class of all past black unsuccessful job applicants, but refused to broaden the class to include future black applicants or persons deterred from applying by A&I's alleged discriminatory practices or reputation. After full trials on the merits, the court granted judgments for the defendants on all claims.
 
 
 6
 On appeal, the plaintiffs contend (1) that the district judge erroneously refused to recuse himself in the A&I case;[5] (2) that the court improperly refused to certify classes in the PEER and College Board cases; (3) that the court improperly narrowed the class certified in the A&I case; and (4) that the court's judgments on the merits are legally incorrect or clearly erroneous. We affirm the district court's decisions as to recusal and as to some of the individual claims. We reverse, however, as to the remaining individual claims, as to the class certification issues, and as to the merits of the class claim in the A&I case.
 
 I. RECUSAL
 
 7
 Barbara Phillips, acting on behalf of her co-plaintiffs, filed an Affidavit of Personal Bias and Prejudice in the A&I case, seeking the recusal of Judge William Harold Cox. Phillips's affidavit did not state any facts relating to any bias against any of the particular plaintiffs or in favor of any of the particular defendants in the case. Rather, she attempted to show that Judge Cox is prejudiced against all blacks and that he is hostile to civil rights suits. Some of her allegations are conclusory accusations, lacking in particularity. Others recite particular judicial rulings, quotations from written opinions, and alleged remarks from the bench, in five cases over Judge Cox's nineteen-year judicial career. Phillips also recited statistics concerning the frequency with which this Court has affirmed or reversed Judge Cox's rulings in civil rights cases.
 
 
 8
 There are two statutes governing recusal of federal district judges. 28 U.S.C. §§ 144, 455 (1976). Section 144 provides in part:
 
 
 9
 Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.
 
 
 10
 If an affidavit filed under section 144 is timely and technically correct, its factual allegations must be taken as true for purposes of recusal. The judge must pass on the legal sufficiency of the affidavit, but he may not pass on the truth of the matters alleged. Berger v. United States, 1921, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481; Parrish v. Board of Commissioners, 5 Cir. 1975, 524 F.2d 98, 100 (en banc), cert. denied, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976); Davis v. Board of School Commissioners, 5 Cir. 1975, 517 F.2d 1044, 1051, cert. denied, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976); United States v. Roca-Alvarez, 5 Cir. 1971, 451 F.2d 843, 847-48. In Parrish, we stated that an affidavit is legally sufficient if it meets a three-part test:
 
 
 11
 1. The facts must be material and stated with particularity.
 
 
 12
 2. The facts must be such that, if true, they would convince a reasonable person that bias exists.
 
 
 13
 3. The facts must show the bias is personal, as opposed to judicial in nature.
 
 
 14
 524 F.2d at 100, quoting United States v. Thompson, 3 Cir. 1973, 483 F.2d 527, 528, cert. denied, 415 U.S. 911, 94 S.Ct. 1456, 39 L.Ed.2d 496 (1974).
 
 
 15
 Congress rewrote the second statute, section 455, in 1974. Subsection (b) of that section lists a number of specific situations in which a judge must recuse himself; none apply here. Subsection (a), a more general provision, requires that
 
 
 16
 Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
 
 
 17
 Section 455, unlike section 144, does not stipulate a formal procedure by which it must be raised. Like section 144, however, it may be raised by motion. Davis, 517 F.2d at 1051. Substantively, the two statutes are quite similar, if not identical.[6]
 
 
 18
 Under either statute, the alleged bias must be "personal", as distinguished from judicial, in nature. Davis, 517 F.2d at 1052; Parrish, 524 F.2d at 100; Steering Committee v. Mead Corp., 5 Cir. 1980, 614 F.2d 958, 964-65; United States v. Serrano, 5 Cir. 1979, 607 F.2d 1145, 1150, cert. denied, 445 U.S. 965, 100 S.Ct. 1655, 64 L.Ed.2d 241 (1980); Whitehurst v. Wright, 5 Cir. 1979, 592 F.2d 834, 837-38; Heppele v. Johnston, 5 Cir. 1979, 590 F.2d 609, 613; United States v. Archbold-Newball, 5 Cir. 1977, 554 F.2d 665, 682, cert. denied, 434 U.S. 1000, 98 S.Ct. 644, 54 L.Ed.2d 496 (1973). The point of the distinction is that the bias "must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case". United States v. Clark, 5 Cir. 1979, 605 F.2d 939, 942 (per curiam). Thus, a motion for disqualification ordinarily may not be predicated on the judge's rulings in the instant case or in related cases, nor on a demonstrated tendency to rule any particular way, nor on a particular judicial leaning or attitude derived from his experience on the bench. United States v. Grinnell Corp., 1966, 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778, 793; Berger, 255 U.S. at 31, 41 S.Ct. at 232; Steering Committee, 614 F.2d at 964; Serrano, 607 F.2d at 1150; Clark, 605 F.2d at 942; United States v. Caicedo-Asprilla, 5 Cir. 1980, 632 F.2d 1161, 1165.[7]
 
 
 19
 Here, most of Phillips's allegations concern Judge Cox's rulings or comments on the merits in previous cases. Some of them are misleadingly quoted out of context. At times, especially in some of the older instances, his remarks reflected racial reactions not only outmoded but improper. These remarks were unseemly, and we do not condone them. Nevertheless, they are not enough to require recusal. The comments alleged are not gratuitous insults and do not show overt hostility or the like; in every instance they concern the district judge's final conclusions or immediate reactions on points of fact or law in the case before him. We would be reluctant, in any but an extreme case, to base a disqualification order on such allegations. It is a district judge's duty to conduct trials, weigh evidence, consider the law, exercise his discretion, and reach decisions in the cases on which he sits. If he understands that a seemingly harsh comment toward a party or an attorney, or a perceived tendency to give severe sentences to some class of offenders, or an aggregate imbalance in victories for plaintiffs or defendants in a particular class of cases may subject him to a train of successful recusal motions in future cases, he may consciously or subconsciously shape his judicial actions in ways unrelated to the merits of the cases before him. Whether his conclusions in every case are the same as those that we (or these plaintiffs) would have reached is immaterial. A judge is not a computing machine, and the judicial system is not constructed so that each judge must reach the same result as all other judges in a given case. If a judge's "error" amounts to incorrect law or an abuse of discretion, appellate courts exist to correct it. Within that boundary, he not only may, but should, exercise his independent judgment on the facts and on the law. Presumably, for this attribute, among others, he was appointed. See Serrano, 607 F.2d at 1150-51; United States v. Johnson, 4 Cir. 1976, 537 F.2d 1170, 1175; Baskin v. Brown, 4 Cir. 1949, 174 F.2d 391, 394; B. Cardozo, The Nature of the Judicial Process 98-141 (1921); Davis, A System of Judicial Notice Based on Fairness and Convenience, in Perspectives of Law 69, 73-74 (R. Pound, ed., 1964); Friendly, The Courts and Social Policy: Substance and Procedure, 33 U.Miami L.Rev. 21 (1978); Advisory Committee's Note, Fed.R.Evid. 201.
 
 
 20
 We do not mean to hold that prejudice against a class, as opposed to a particular litigant, can never form the basis for recusal. See Davis, 517 F.2d at 1051. Nor do we say that a clearly evinced policy of disregarding the merits in any class of cases can withstand a recusal motion. See United States v. Thompson, 3 Cir. 1973, 483 F.2d 527, cert. denied, 415 U.S. 911, 94 S.Ct. 1456, 39 L.Ed.2d 496 (1974). See also United States v. Clements, 5 Cir. 1981, 634 F.2d 183. But we caution against a district judge disqualifying himself on the basis of an allegation of a perceived history of rulings that a moving party dislikes. This case provides a good example of the results that might follow. Phillips's affidavit contains nothing pertaining to the parties or subject matter of the A&I case; it could be repeated, word for word, by literally any black civil rights plaintiff from now until Judge Cox's retirement. With only minor modifications, it could be used by any black party a black criminal defendant, say. This is a type of recusal for whole classes of cases, without the constitutional safeguards that protect a judge from removal from office save by impeachment. The Constitution does not contemplate that we dispense with a judge's service on such a grand scale on any but the most compelling showing. See Steering Committee, 614 F.2d at 966; Archbold-Newball, 554 F.2d at 682; United States v. Partin, 5 Cir. 1977, 552 F.2d 621, 637 n.20, cert. denied, 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977). Congress has provided another remedy for judicial intemperance. Judicial Councils Reform and Judicial Conduct and Disability Act of 1980, Public Law 96-458, § 3, 96th Congress, 94 Stat. 2035, 2036 (1980), amending 28 U.S.C. § 372.
 
 
 21
 We also do not suggest that Judge Cox was required not to recuse himself. Another judge, facing a similar question, might well decide the other way. A recusal motion is committed to the sound discretion of the district judge, and on appeal we ask only whether he has abused his discretion. Davis, 517 F.2d at 1052; United States ex rel. Weinberger v. Equifax, Inc., 5 Cir. 1977, 557 F.2d 456, 463-64, cert. denied, 434 U.S. 1035, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978). We cannot say here that he has done so.
 
 II. CLASS CERTIFICATION
 
 22
 The plaintiffs assert errors in all three cases concerning class certification. In the PEER case the district court refused to certify a class of unsuccessful past black applicants, future black applicants, and persons deterred from applying because of the Committee's reputation or history as an employer given to race discrimination. The court held that the purported class was not numerous enough under Fed.R.Civ.P. 23(a)(1). In the College Board case the court refused to certify a similar class on the ground that the plaintiffs did not show that they could adequately represent the class, in light of their delay in moving for class certification. In both cases the defendants assert an alternative ground for the court's refusal: an alleged conflict of interest between the plaintiffs' counsel and the purported class. The A&I case presents the issues differently. There the court certified a class of actual black applicants but refused to include future applicants and deterred persons, citing problems of numerosity, delay in moving, and lack of nexus between the named plaintiffs and the excluded persons. We find that none of the asserted reasons justify the court's decisions to refuse certification or to narrow the class certified.
 
 A. Numerosity
 
 23
 The district court in the PEER case noted that the plaintiffs had met all the requisites for certification of a class under Rule 23(b)(2), except the requirement of Rule 23(a)(1) that the class be so numerous that joinder of all members is impracticable. Since PEER did not record the race of its applicants, it is impossible to tell exactly how many black applicants there were. The plaintiffs nonetheless established at a certification hearing that there were at least 33 such applicants; there may have been many more.[8]
 
 
 24
 The problem before the district court, and now before us, is not simply to say whether 33 class members are enough or too few to satisfy Rule 23(a)(1). Ample case law can be cited to show that smaller classes have been certified and larger ones denied certification for lack of numerosity. See 3B J. Moore & J. Kennedy, Federal Practice P 23.05 (2d ed. 1980). Such number comparisons miss the point of the Rule. The proper focus is not on numbers alone, but on whether joinder of all members is practicable in view of the numerosity of the class and all other relevant factors. Here, neither party can even count how many black applicants there are, let alone identify all of them. Moreover, the alleged class includes future and deterred applicants, necessarily unidentifiable. In such a case the requirement of Rule 23(a)(1) is clearly met, for "joinder of unknown individuals is certainly impracticable". Jack v. American Linen Supply Co., 5 Cir. 1974, 498 F.2d 122 (per curiam); Jones v. Diamond, 5 Cir. 1975, 519 F.2d 1090, 1100; see B. Schlei & P. Grossman, Employment Discrimination Law 1095-97 (1976).
 
 
 25
 The same reasoning holds true in the A&I case, where the district court cited numerosity as a ground for excluding future and deterred applicants from the class certified. Moreover, aside from the inherent impracticability of joinder of such parties, there is the fact that the court did certify a class of actual applicants. It is hard to see how a class already numerous enough can become insufficiently numerous through the inclusion of an unknown number of additional members. See Hebert v. Monsanto Co., 5 Cir. 1978, 576 F.2d 77, 80, vacated on other grounds, 580 F.2d 178 (5 Cir. 1978).
 
 B. Delay
 
 26
 Rule 23(c)(1) commands the district court to decide whether to certify a class in any case "as soon as practicable" after commencement of the action.[9] The district court invoked the principle of that rule in refusing to certify a class in the College Board case, finding that the plaintiffs had delayed too long in moving for class certification. This lapse, it held, warranted denial of the motion because it cast doubt on the plaintiffs' ability to represent the class adequately. See East Texas Motor Freight v. Rodriguez, 1977, 431 U.S. 395, 404-05, 97 S.Ct. 1891, 1897, 52 L.Ed.2d 453, 463. Similarly, the court cited delay as a reason for narrowing the class in the A&I case.[10]
 
 
 27
 We think the court went too far in both cases. Neither East Texas Motor Freight nor any other precedent that we have found has held that delay in moving for certification is sufficient in itself to disqualify a party as a class representative. The case would be different if the plaintiffs' motion had been untimely under an applicable local rule, but here there was no such rule.[11] Although the plaintiffs doubtless could have been more diligent in making their motion, in the circumstances of these cases we do not think their delay was so inexcusable as to render their representation inadequate. The record reflects that a good deal of the time was consumed in litigating the defendants' motions in all three cases for a change of venue, the plaintiffs' motions in two cases for recusal, and the plaintiffs' attempt to obtain mandamus relief in this Court on the recusal issue. The rest of the time was spent in extensive discovery, much of which was relevant to the class certification question. Accordingly, we find that the district court was too draconian in refusing certification on this ground.
 
 C. Conflict of Interest
 
 28
 The defendants in the PEER and College Board cases raise another ground for noncertification, one not relied on by the district court.[12] This Court has adopted a per se rule under Canon 9 of the Code of Professional Responsibility[13] that an attorney who is the partner or spouse of a named class representative is disqualified from acting as counsel for the class. Zylstra v. Safeway Stores, Inc., 5 Cir. 1978, 578 F.2d 102, following Kramer v. Scientific Control Corp., 3 Cir. 1976, 534 F.2d 1085, cert. denied, 429 U.S. 830, 97 S.Ct. 90, 50 L.Ed.2d 94 (1976). In the PEER and College Board cases, counsel for the plaintiffs are the Lawyers' Committee for Civil Rights Under Law and two of its attorneys. Barbara Phillips, one of the three named plaintiffs in the two cases, is one of the attorneys for the Lawyers' Committee (although she is not acting as an attorney in these cases). Accordingly, the defendants argue, if the class were certified, the Lawyers' Committee would be disqualified as counsel. For that reason, they say the plaintiffs are not adequate class representatives under Rule 23(a)(4).[14]
 
 
 29
 Although we agree wholeheartedly with the rule announced in Zylstra and Kramer, we hold that it does not apply here. Our holding in Zylstra is an exception to our general rejection of per se rules under Canon 9 in Woods v. Covington County Bank, 5 Cir. 1976, 537 F.2d 804. The Zylstra rule is directed at a particular ethical problem: the potential conflict that arises when a class representative stands (or appears to stand) to gain financially from an award of attorney's fees made out of a class fund. Put simply, the cause for concern is that the class representative may be too generous with the class's money in granting a fee to his own partner or spouse. See Zylstra, 578 F.2d at 104; Kramer, 534 F.2d at 1089-90, 1091; id. at 1093 (Rosenn, J., concurring). Here the problem does not arise. Any attorney's fee granted in these cases will come directly from the defendants under 42 U.S.C. § 2000e-5(k) (1976), and not from any fund created for class relief; hence, Ms. Phillips would never have the opportunity for overgenerosity.
 
 D. Nexus
 
 30
 The district court in the A&I case concluded that it should exclude from the plaintiff class persons deterred by A&I's policies from applying there because the named plaintiffs lack any "nexus" with deterred persons. The court reasoned that, since the named plaintiffs did apply to A&I, they have no standing to represent persons whose grievance is that they have been prevented from applying.
 
 
 31
 This ground for narrowing the class is faulty as a matter of law. The argument would be sound if these plaintiffs sought to represent a class consisting exclusively of deterred persons; in such a case the plaintiffs would lack standing to represent the putative class, in the same sense that a high school graduate lacks standing to bring a class action challenging a high school requirement. Payne v. Travenol Laboratories, Inc., 5 Cir. 1978, 565 F.2d 895, 898-99, cert. denied, 439 U.S. 835, 99 S.Ct. 118, 58 L.Ed.2d 131 (1978); see East Texas Motor Freight v. Rodriguez, 1977, 431 U.S. 395, 403-04, 97 S.Ct. 1891, 1897, 52 L.Ed.2d 453, 461-63. Here, however, the plaintiffs are members of the class they seek to represent, and the only issue is the breadth of the definition of that class. The requirement that the named plaintiffs' claims be "typical" of the claims of the class, Fed.R.Civ.P. 23(a)(3), does not mean that all claims must be identical. Rather, a named plaintiff who has allegedly suffered from the defendant's racial discrimination may bring an "across the board" class action to represent all persons who have suffered from the same discriminatory policies, whether or not all have experienced discrimination in the same way. Satterwhite v. City of Greenville, 5 Cir. 1978, 578 F.2d 987, 993-94 n.8 (en banc), vacated on other grounds, 445 U.S. 940, 100 S.Ct. 1334, 63 L.Ed.2d 773 (1979); Hebert v. Monsanto Co., 5 Cir. 1978, 576 F.2d 77, vacated on other grounds, 580 F.2d 178 (1978); Long v. Sapp, 5 Cir. 1974, 502 F.2d 34; Johnson v. Georgia Highway Express, 5 Cir. 1969, 417 F.2d 1122. Hence, we have approved the practice of allowing rejected applicants to represent classes including those deterred from applying. E. g., Jack v. American Linen Supply Co., 5 Cir. 1974, 498 F.2d 122 (per curiam). Indeed, if this were not the case, most such persons would go without relief entirely, since it is unlikely that one of them would sue and qualify as a class representative.
 
 
 32
 Because the district court erred in refusing to certify any class in the PEER and College Board cases, we remand them for trial as to the class allegations.[15] The A&I case went to trial as a class action. It does not appear that the court's error in restricting the class scope could have affected the trial in any important way. We therefore reach the class merits in that case.
 
 III. THE MERITS: THE A&I CLASS ACTION
 
 33
 In reviewing the merits of the case as to alleged class discrimination, we keep in mind that the district court's finding of nondiscrimination is a determination of ultimate fact to which the "clearly erroneous" standard of review does not apply. (We are bound, of course, by the district court's findings of subsidiary fact and judgments of credibility unless they are clearly erroneous.) Fed.R.Civ.P. 52(a); Williams v. Tallahassee Motors, Inc., 5 Cir. 1979, 607 F.2d 689, 690; East v. Romine, Inc., 5 Cir. 1975, 518 F.2d 332, 338-39; Causey v. Ford Motor Co., 5 Cir. 1975, 516 F.2d 416, 420-21.
 
 
 34
 The record indicates that the A&I Board employed no blacks from its inception in 1942 through 1972. In 1973 the first black was hired to form and head a new subunit, the Office of Minority Business Enterprise (OMBE). According to a stipulated set of employee lists, the Board employed five blacks in December 1974 (7.9 percent of the Board's total); eleven blacks in December 1975 (12.0 percent); fifteen blacks in December 1976 (17.6 percent); and thirteen blacks in 1977 (12.5 percent). These figures are skewed, however, by the inclusion of the OMBE staff and short-term employees hired under the federal Comprehensive Employment and Training Act (CETA).[16] Both programs derive most of their funds from federal sources. OMBE has its own hiring procedure, separate from the rest of the Board.[17] Its staff has always been all or nearly all black. The record does not reflect how CETA employees are hired, but their positions are temporary. The CETA program is subject to closer federal scrutiny as to equal employment practices than is A&I's employment generally. Excluding these persons, the figures are much lower: one black (1.5 percent) in 1974; one black (1.4 percent) in 1975; seven blacks (9.5 percent) in 1976; and six blacks (6.5 percent) in 1977. Even these statistics hide another key fact: although roughly half of the Board's staff is professional, technical or managerial, A&I has never hired a black permanent employee (outside of OMBE) for anything but a clerical position.
 
 
 35
 Most of the real debate between the parties concerns the relevant labor market to which A&I's hiring statistics are to be compared.[18] Actual applicant flow, often the best measurement, is unavailable here because A&I does not identify its applicants by race. Other statistical measures are necessarily imperfect in differing ways and varying degrees. The best the court can do is to accept what figures are available; allow for imperfections, skewing factors, and margins of error; and then take the figures for what they are worth. Sometimes this is much, sometimes little. See United Brotherhood of Teamsters v. United States, 1977, 431 U.S. 324, 340, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396, 418; Williams, 607 F.2d at 693; Hester v. Southern Ry., 5 Cir. 1974, 497 F.2d 1374, 1379-81.
 
 
 36
 The general population of Mississippi was 37.2 percent black at the time of the 1970 census. According to figures from the Mississippi Employment Security Commission, the total civilian work force was 29.8 percent black in 1977. In February 1978, 31.6 percent of persons registering at that Commission for professional, technical, or managerial employment were black; 27.8 percent of registrants for clerical or sales jobs were black. Although these statistics have their flaws, we think the disparity between them and the Board's hiring record is sufficient to raise a prima facie case of class discrimination and to shift the burden to the Board to show that the discrepancy results from other causes. Robinson v. Union Carbide Corp., 5 Cir. 1976, 538 F.2d 652, 659-61, modified on other grounds, 544 F.2d 1258 (5 Cir. 1977), cert. denied, 434 U.S. 822, 98 S.Ct. 65, 54 L.Ed.2d 78 (1977).
 
 
 37
 A&I's only substantial response is to point out that only 11.5 percent of all high school graduates in the Mississippi work force were black (as of 1973, the latest year for which figures are in evidence).[19] This is material, but, by itself, it is insufficient. Many of A&I's clerical positions do not require a high school diploma, according to the Board's own job descriptions. Moreover, almost all of the nonclerical positions require a college degree; blacks made up 18.1 percent of the Mississippi work force with degrees. Considered against the figure for A&I's black nonclerical hiring zero, outside of OMBE that figure does much to deflate the rebuttal argument.[20]
 
 
 38
 Even so, we might hesitate to find discrimination in this case on the basis of these statistics alone. Here, however, there are other indicators. The district court found that A&I has a clear history of discrimination, not having hired a single black during its first three decades of existence. Its hiring procedures rely heavily on the subjective judgments of its executives from personal interviews, a procedure that can easily be used to mask racially motivated hiring decisions.[21] Such facts can buttress statistical evidence by suggesting a qualitative explanation for a quantitative result.
 
 
 39
 In light of these facts, as found by the district court and amply supported by the record, we conclude that the district court erred in its conclusion of nondiscrimination against the class. On remand, the district court should direct the Board to set goals of about twenty percent black employment outside OMBE, separately for clerical and nonclerical positions. A&I should undertake an aggressive campaign of recruitment and advertisement to procure sufficient qualified black applicants to make these goals feasible. Further, until these goals are achieved, one third of all persons hired within predetermined six-month periods for permanent clerical or nonclerical jobs outside OMBE shall be black. The district court shall take any other concurrent or later actions necessary to eliminate the effects of past discrimination at A&I and to procure the rights of the plaintiff class and its members. See Morrow v. Crisler, 5 Cir. 1974, 491 F.2d 1053 (en banc), cert. denied, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1979); Franks v. Bowman Transportation Co., 5 Cir. 1974, 495 F.2d 398, 418-20, rev'd in part on other grounds, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); NAACP v. Allen, 5 Cir. 1974, 493 F.2d 614; Davis v. County of Los Angeles, 9 Cir. 1977, 566 F.2d 1334, 1342-44, vacated as moot, 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979); United States v. City of Chicago, 7 Cir. 1977, 549 F.2d 415, 436-37, cert. denied, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1978); Boston Chapter, NAACP, Inc. v. Beecher, 1 Cir. 1974, 504 F.2d 1017, 1026-28, cert. denied, 421 U.S. 910, 96 S.Ct. 1561, 43 L.Ed.2d 775 (1975); United States v. Masonry Contractors Ass'n, 6 Cir. 1974, 497 F.2d 871, 877; Erie Human Relations Commission v. Tullio, 3 Cir. 1974, 493 F.2d 371; Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Service Commission, 2 Cir. 1973, 482 F.2d 1333, 1339-41, cert. denied, 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975); Carter v. Gallagher, 8 Cir. 1971, 452 F.2d 315, 330-31 (en banc), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972).
 
 IV. THE MERITS: THE INDIVIDUAL CLAIMS
 
 40
 The standard and order of proof in an individual claim under Title VII are by now familiar. To raise a prima facie case, the plaintiff must show (1) that he belongs to a racial minority; (2) that he applied and was qualified for a job for which the employer was seeking applicants; (3) that, despite his qualifications, he was rejected; and (4) that, after his rejection, the position remained open. The burden then shifts to the employer to show some legitimate, nondiscriminatory reason for the applicant's rejection.[22] The plaintiff is then afforded a fair opportunity to show that the employer's stated reason is in fact a pretext. McDonnell Douglas Corp. v. Green, 1973, 422 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668; Furnco Construction Co. v. Waters, 1978, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957. This formula must not be applied mechanically, but flexibly, with a view toward the particular hiring procedures and factual situation presented. McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. at 1824; Peters v. Jefferson Chemical Co., 5 Cir. 1975, 516 F.2d 447, 450. On appellate review, we are bound by the district court's findings of credibility and of subsidiary fact unless they are clearly erroneous. The clear error standard, however, does not apply to the ultimate conclusion of discrimination or nondiscrimination. Williams v. Tallahassee Motors, Inc., 5 Cir. 1979, 607 F.2d 689, 690; East v. Romine, Inc., 5 Cir. 1975, 518 F.2d 332, 338-39; Causey v. Ford Motor Co., 5 Cir. 1975, 516 F.2d 416, 420-21.
 
 A. The PEER Case
 
 41
 1. Barbara Phillips. Barbara Phillips applied to the PEER Committee on July 12, 1974. She had interviews with John Hamilton, the Director of the Committee staff, and John Turcotte, a staff auditor. Both men testified that they were very favorably impressed with Phillips's credentials, her manner, and her knowledge of PEER's functions.[23] At their request, she brought in a writing sample. The two men decided right away to hire Phillips, but they did not inform her of that. After the initial interview, Phillips was never told that she was under serious consideration.[24] Three weeks after their interview with her, Hamilton and Turcotte saw reports on television and in a newspaper that Ms. Phillips had filed EEOC complaints against PEER and other agencies and that she was acting as a consultant to the Mississippi Council on Human Relations.[25] The district court found that she would have been hired but for these news reports. Hence, it concluded, PEER established a legitimate reason for not hiring Phillips Hamilton's and Turcotte's beliefs that she was already employed. The court also held that Phillips had not shown that reason to be a pretext.[26]
 
 
 42
 After carefully examining the record, we believe that this finding is clearly erroneous. The defendant's theory fails because it cannot adequately explain why, if Hamilton and Turcotte were so impressed with Ms. Phillips's qualifications that they decided immediately to hire her, they procrastinated for several weeks. In fact, the record shows that race was very much on their minds. Hamilton testified that hiring Phillips was "an important decision" because she would have been the first black employee at PEER. He and Turcotte were concerned about the reaction of the white legislators on the Committee and the white staff to such a step, as well as Phillips's own reaction to the "alien world" of the white-dominated agency. The reason for the delay, both men testified, was that they were mulling over the "significance" or "complexities" of hiring blacks at PEER.[27] One need not question the good faith of Hamilton and Turcotte to conclude that the ultimate decision not to hire Ms. Phillips was as much due to her race as was the delay in offering her a position. Given their enthusiasm for her qualifications, it is hard to believe that they would not have at least inquired as to the possibility of hiring her away from her "consulting" position but for their apprehensions about her race.[28] We do not mean to say that Title VII always requires an employer to pursue black applicants even after they are hired elsewhere. We hold only that, on the record in this case, we cannot avoid the conclusion that the reason offered was a convenient way out of an uncomfortable decision in other words, a pretext.
 
 
 43
 2. Melvin Phillips. Melvin Phillips applied to PEER on August 30, 1974. John Turcotte interviewed him. When he called back the next day he was told that there were no openings. The district court found that Turcotte rejected Mr. Phillips because he had expressed a reservation during the interview about job-related travel.[29]
 
 
 44
 This finding is clearly erroneous. There is literally no evidence that Mr. Phillips said in his interview that he was unwilling to travel. On the contrary: although Turcotte testified that he had told Phillips about the travel requirements of the job, he was certain that Phillips had not expressed any reservation about them.[30]
 
 
 45
 Presumably, what the district court had in mind was Mr. Phillips's statement on his employment application that he had left his last job because it required excessive travel.[31] Turcotte testified that it was this expression of reluctance that had led to the decision not to hire Phillips.[32] If this was indeed the reason for the rejection, it is insufficient as a matter of law to rebut Phillips's prima facie case. Turcotte's reason was, at best, a bare assumption about Phillips's intentions at the time of his application an assumption made all the more unreasonable by Phillips's silence about the travel requirements Turcotte described to him and Turcotte's failure to ask the obvious question. We have held that an unchecked assumption that an applicant would not accept a job cannot be a legitimate reason for failing to offer the job, or at least to make inquiry about the assumption. Davis v. Jackson County Port Authority, 5 Cir. 1980, 611 F.2d 577. Here, in fact, Phillips testified that he had not said anything about travel because he was unemployed and needed the job to support his family. He later took a job requiring travel.[33]
 
 
 46
 3. Cornell Green Rice. On September 19, 1974, Cornell Rice visited PEER's offices to apply for a clerical or secretarial job. She left a completed (although unsigned) application form with a receptionist, but she did not speak with anyone else or set up an interview. She never called back or made any further effort to keep in contact with PEER.
 
 
 47
 The district court found that Rice did not make out a prima facie case because there were no vacancies for which she was qualified. This is probably incorrect.[34] Even so, it is clear from the record that the defendants showed a valid, nondiscriminatory reason for not hiring Rice. According to the uncontradicted testimony of Turcotte and Hamilton, it was routine practice at PEER to make no effort to make further contact with "walk-in" applicants those who do nothing more than leave or mail in a resume or application form.[35] Rice's attempt to impeach this explanation by counterexample only reinforced it.[36] It is not for us to say whether this procedure is sensible, or even fair; it is sufficient for our purposes that it is race-neutral and that it has not been shown to be pretextual. Accordingly, we decline to disturb the district court's ruling on this claim.
 
 B. The College Board Case
 
 48
 1. Barbara Phillips. On July 9, 1974, Barbara Phillips went to the receptionist's desk on the first floor of the building in which the Board's offices are located. She took an application form home, filled it out, and mailed it in. Ten days later, Dr. E. E. Thrash, the Board's executive director, sent her a letter stating that there were no vacancies for a person of Phillips's qualifications.
 
 
 49
 We find no clear error in the district court's finding that Ms. Phillips was not qualified for any vacant position. The Board employs a staff of about 18 persons; most of its work concerns the financial problems of Mississippi higher education. Thrash testified that he rejected Phillips because there was nothing in her application to suggest that she had any experience or expertise in financial matters or in higher education.[37] Her education had been in history and in law, proficiency at which would not qualify her for any of the Board's professional positions.[38] Nor did she appear to be qualified for most clerical jobs, since she left blank the space on her application for typing and shorthand skills.[39] She was qualified, Thrash testified, for the position of file clerk, but that job has not been open since before 1974.[40] We believe that this evidence provides adequate support for the district court's ruling.
 
 
 50
 2. Melvin Phillips. Melvin Phillips testified that he went to the College Board on September 6, 1974. A receptionist informed him that there were no application forms, but he had an informal interview with Charles Coffman, an associate director. Coffman, Phillips said, told him that there were no openings then and that there were no positions for persons with B.A. degrees.[41]
 
 
 51
 The district court rejected Mr. Phillips's testimony and found that he had not applied to the Board. This was error. This finding rests on a misreading of Coffman's testimony; indeed, the parties stipulated in the pretrial order that Phillips did apply.[42]
 
 
 52
 Despite this discrepancy, we affirm the district court's ruling. Examination of the record reveals that, during the year following Mr. Phillips's application, only one white applicant was hired in a position that Phillips might have filled. That one, Ward Shaw, had a master's degree in economics and experience as a college instructor. He was hired on a temporary basis to do a study of the feasibility of certain proposed program additions at Alcorn State University, a job for which he was better qualified than Phillips.[43] Given this absence of any relevant vacancies, we must agree that Phillips did not make out a prima facie case of racial discrimination.
 
 
 53
 3. Cornell Green Rice. Cornell Rice interviewed with Thrash on September 19, 1974. He told her that there were no jobs open then and would be none in the foreseeable future. She left her resume and application. She never heard from the Board.[44]
 
 
 54
 The district court found that Rice was not hired because there were no vacancies when she applied.[45] This is clearly erroneous. The evidence shows that Bonnie Childers, a white, was hired as a secretary scarcely two months after Rice's application.[46] The defense made no attempt to show that Childers was better qualified than Rice, and there is no indication of how long the vacancy she filled had existed.[47] A vacancy, within the meaning of the McDonnell Douglas test, need not exist on the precise day of application; any vacancies within a reasonable time must be considered as well.[48] McLean v. Phillips-Ramsey, Inc., 9 Cir. 1980, 624 F.2d 70, 72 (per curiam); Neely v. City of Grenada, 1977, N.D.Miss., 438 F.Supp. 390, 409; see East v. Romine, Inc., 5 Cir. 1975, 518 F.2d 332, 338. Since no attempt was made to show a legitimate reason for hiring Childers instead of Rice, we hold that Rice is entitled to judgment.
 
 C. The A & I Case
 
 55
 The individual claims in the A & I case come to us in a different posture from those in the other two cases because of our holding that the plaintiffs proved that A & I is guilty of discrimination against the plaintiff class.[49] The establishment of liability on the class claim operates to establish a prima facie case on behalf of each member of the class. Once the individual plaintiff proves that he applied unsuccessfully, the burden shifts to the employer to establish that its failure to hire that individual was the result of legitimate nondiscriminatory reasons. International Brotherhood of Teamsters v. United States, 1977, 431 U.S. 324, 357-62, 97 S.Ct. 1843, 1865-68, 52 L.Ed.2d 396, 428-32; Franks v. Bowman Transportation Co., 1976, 424 U.S. 747, 771-73 & n.32, 96 S.Ct. 1251, 96 S.Ct. 1267-68 & n.32, 47 L.Ed.2d 444, 466-67.
 
 
 56
 1. Barbara Phillips. Barbara Phillips visited the A & I Board during July 1974. She testified that she was interviewed by Harold Cross, administrative assistant to the director, but other evidence shows (and the district court found) that Phillips actually spoke with Robert Robinson, the executive director.[50] Robinson testified that he was very impressed with Phillips's credentials and intelligence, but that he had no positions at that time suitable for her. He offered to assist her in obtaining a job at another agency. At the same time, however, he described to her a new position that he wanted to create in the Industrial Department, for which he thought Phillips would be well suited. He took two telephone numbers for her and asked her to check back. Over the next three weeks Robinson worked at arranging federal funds for the new position. When he succeeded, he called Phillips's telephone numbers to speak to her about the job. At one there was no answer; at the other, he was told that Phillips had moved to Chicago to resume her law school studies at Northwestern University. He abandoned his plans for the new job.[51]
 
 
 57
 The district court credited Robinson's testimony and found that the sole reason why Phillips was not hired was because Robinson believed she was no longer interested in employment in Jackson. There is abundant evidence to support this finding. In light of the facts, it is not clear that Phillips was rejected at all. Even if she was, we agree with the district court that Robinson's testimony adequately established a legitimate, nondiscriminatory reason for the rejection.[52]
 
 
 58
 2. Melvin Phillips. Melvin Phillips applied at the A & I Board on August 28, 1974. After filling out an application, he spoke briefly with Harold Cross. Cross said there were no jobs available in A & I, but referred him to Thomas Espy, head of OMBE. Espy also had no jobs. Phillips called Espy a few times, but he never heard from A & I again.[53]
 
 
 59
 The district court held against Phillips because, it concluded, he was only available for employment for a short period of time, and all white applicants hired during that period were better qualified than he.[54] We think that the court improperly constricted its scrutiny of the Board's hiring. Title VII does not require a plaintiff to remain permanently unemployed or forfeit his cause of action for racial discrimination. Nor can the Board contend here, as it did in the case of Barbara Phillips, that Phillips's apparent departure from the job market was a legitimate reason for not hiring him, for there is no evidence that anyone at A & I ever learned that he had taken another job. According to A & I's own written procedures and Cross's testimony, applicants remain under active consideration for all openings within a year of the date of application.[55] During the year following Phillips's application, A & I hired seventeen non-clerical employees, fourteen of whom were white. Excluding OMBE and temporary CETA appointments, they hired four such persons, all white.[56] A & I's failure to show a legitimate business reason for hiring these persons instead of Phillips is fatal to its defense.
 
 
 60
 3. Cornell Green Rice. Cornell Rice applied at A & I on September 18, 1974, and interviewed briefly with Espy. He said he would refer her application "upstairs" (i. e., to A & I). She later received a letter from Espy advising her that there were no jobs available.[57]
 
 
 61
 Rice's case is similar to Melvin Phillips's. The district court ruled against Rice because it found that she had been available for employment for only a few days, and there were no secretarial or clerical vacancies during that time. Again, though, there was no suggestion that Rice's application was removed from consideration prematurely, for no one at A & I knew of her new job. During the year following her application, A & I hired nineteen whites and six blacks in clerical jobs. If OMBE and CETA jobs are excluded, the figures are nine white, one black.[58] As with Melvin Phillips, the absence of any business justification for these hirings defeats the Board's rebuttal of the prima facie case established under Franks and Teamsters.
 
 SUMMARY
 
 62
 To summarize our disposition of these cases:
 
 
 63
 We AFFIRM the judgment in the A & I case with regard to the issue of recusal.
 
 
 64
 We REVERSE the district court's refusal to certify the alleged classes in the PEER and College Board cases. Those cases are REMANDED for appropriate proceedings as to the administration of the class action and the merits of the class allegations. We MODIFY the class certification order in the A & I case to include in that class future applicants and persons deterred from applying for jobs with A & I.
 
 
 65
 We REVERSE the judgment in the A & I case that the plaintiffs did not establish discrimination against the class. The case is REMANDED for appropriate relief consistent with this opinion.
 
 
 66
 We REVERSE the court's judgments on the merits with respect to Barbara Phillips's individual claim in the PEER case; Melvin Phillips's individual claims in the PEER and A & I cases; and Cornell Rice's individual claims in the A & I and College Board cases. We REMAND the cases for appropriate relief. We AFFIRM the district court's judgments as to the remaining individual claims.
 
 
 67
 Although we have refused to overturn the district court's denial of the plaintiffs' recusal motion, in light of later developments and all of the circumstances presented in these cases, we suggest that any proceedings on remand should be heard before a judge other than the Hon. William Harold Cox. We do so without in any way questioning the integrity or impartiality of that Judge; we act solely in the interest of preserving the complete appearance of impartiality. See Webbe v. McGhie Land Title Co., 10 Cir. 1977, 549 F.2d 1358, 1361; Eckles v. Sharman, 10 Cir. 1977, 548 F.2d 905, 911; United States v. Bray, 10 Cir. 1976, 546 F.2d 851, 860; United States v. Ritter, 10 Cir. 1976, 540 F.2d 459, 464-65, cert. denied, 429 U.S. 951, 97 S.Ct. 370, 50 L.Ed.2d 319 (1976).
 
 
 
 [1]
 The Mississippi Council on Human Relations was an original party plaintiff in all three cases. It was dismissed for lack of a real interest in the outcome in the PEER and A&I cases
 
 
 [2]
 In all three cases there are also individual defendants: the members of each defendant board or committee, certain staff executives, and other present and former state officers
 
 
 [3]
 42 U.S.C. §§ 2000e to 2000e-17 (1976). The complaints also cited id. §§ 1981, 1983. The plaintiffs appeal only on the Title VII judgments
 
 
 [4]
 The PEER and A&I cases were assigned to Hon. William Harold Cox. U.S. Magistrate John R. Countiss presided over the trials and most other proceedings in the cases. Judge Cox adopted Magistrate Countiss's findings of fact and conclusions of law. The College Board case was assigned to and tried by Hon. Walter L. Nixon, Jr
 
 
 [5]
 As noted, the same judge refused recusal in the PEER case as well. The plaintiffs have chosen not to appeal that decision
 
 
 [6]
 To the extent that there is a difference, section 455 imposes the stricter standard: a movant under section 144 must allege facts to convince a reasonable person that bias exists, Parrish, 524 F.2d at 100, while under the broader language of section 455, he must show only that a reasonable person "would harbor doubts about the judge's impartiality", Potashnick v. Port City Constr. Co., 5 Cir. 1980, 609 F.2d 1101, 1111 (emphasis added), cert. denied, --- U.S. ----, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980). See Comment, Disqualification of Federal Judges for Bias or Prejudice, 46 U.Chi.L.Rev. 236, 243-50 (1978). See also Note, Disqualification of Judges and Justices in the Federal Courts, 86 Harv.L.Rev. 736, 745-50 (1973)
 On the other hand, section 455, unlike section 144, does not require the judge to accept all allegations by a moving party as true. Indeed, the section requires no motion at all; the judge must disqualify himself if the facts cast doubt on his impartiality regardless of how or by whom they are drawn to his attention. See Fredonia Broadcasting Corp. v. RCA Corp., 5 Cir. 1978, 569 F.2d 251, 254-57, cert. denied, 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 167 (1979). Section 144, by contrast, requires allegation by affidavit within a stringent time limit and allows a party only one such affidavit in any case. If a party could bind a judge by his factual allegations in a section 455 motion, free from the formal requirements and more demanding standard of proof of section 144, the result would be a virtual open season for recusal. See 46 U.Chi.L.Rev. at 250.
 
 
 [7]
 The single fact that a judge's remarks or behavior take place in a judicial context does not exclude them from scrutiny if they reflect "such pervasive bias and prejudice ... as would constitute bias against a party". Davis, 517 F.2d at 1051; Whitehurst, 592 F.2d at 838. See also United States v. Ritter, 10 Cir. 1976, 540 F.2d 463 (per curiam), cert. denied, 429 U.S. 951, 97 S.Ct. 370, 50 L.Ed.2d 319 (1976)
 
 
 [8]
 The defendants tentatively identified eleven unsuccessful black applicants, based on the recollection of PEER executives or on the fact that some applicants graduated from predominantly black universities or colleges. Nausead Stewart, an attorney for the plaintiffs, testified that she was personally acquainted with eight other applicants and knew them to be black. Finally, fourteen black applicants were identified by comparing PEER's applicant list with a voter registration list for the City of Jackson. The court accepted the figure 33. 3 Record at 73. There may have been many more. Any black applicant who attended an integrated college, who did not register to vote in Jackson, and who did not know Stewart would not have been identified as black
 
 
 [9]
 Rule 23(c)(1) is cast as a command to the district court, not the parties; hence, a district court has an obligation to make the determination on its own motion if necessary. Gore v. Turner, 5 Cir. 1977, 563 F.2d 159, 165; United States v. United States Steel Corp., 5 Cir. 1975, 520 F.2d 1043, 1052, cert. denied, 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77 (1976); Garrett v. City of Hamtramck, 6 Cir. 1974, 503 F.2d 1236, 1243; Castro v. Beecher, 1 Cir. 1972, 459 F.2d 725, 731
 
 
 [10]
 This, of course, is inconsistent with the court's certification of the narrowed class in the A&I case. Since we conclude that delay would not justify a complete refusal to certify either the lesser or the greater class, we need not decide how best to resolve the inconsistency
 
 
 [11]
 S.D.Miss. Local Rule 18, requiring that plaintiffs move for class certification within 45 days of the filing of the last answer, had not been adopted at the time of trial
 
 
 [12]
 The district court has expressly rejected this contention in a related case. Mississippi Council on Human Relations v. Mississippi Dept. of Justice, Civil No. J76-118(R) (S.D.Miss.) (Opinion of June 18, 1980, on motion to disqualify counsel)
 
 
 [13]
 "A lawyer should avoid even the appearance of professional impropriety."
 
 
 [14]
 The defendants' attempted use of the Kramer-Zylstra rule requires something of a leap in logic. Kramer and Zylstra both involved motions to disqualify counsel. Each of the cases before us, by contrast, involves a contention that a would-be class representative should not be allowed to serve. As the Kramer Court noted, the issues raised in the two contexts are "related, but not identical.... (One) relates to who may serve as class representative, while the (other) relates to who may serve as counsel." 534 F.2d at 1088. Supposing that the Lawyers' Committee is disqualified from representing the class under Zylstra, it does not necessarily follow that the class may not be certified. For example, the district court could make certification contingent on replacement of counsel or on severance of the individual claim of the offending class representative. We need not reach this problem, however, since we hold that the Lawyers' Committee may properly represent the classes
 
 
 [15]
 Despite counsel's statements to the contrary, it is apparent from the record that the court in each case conducted the trial solely as an action on the named plaintiffs' individual claims, and that evidence pertaining to class allegations was excluded. PEER Transcript at 17-18; College Board Transcript at 21, 44, 49. We therefore decline to reach the class merits of these cases
 
 
 [16]
 Pub.L.No.93-203, 87 Stat. 839 (1973), later codified at 29 U.S.C. §§ 801 to 999 (Supp. III 1979)
 
 
 [17]
 There is much dispute between the parties as to whether OMBE is really "part of" A&I. The point is unimportant. Thomas Espy, the OMBE director, did all the hiring for OMBE (subject to the approval of the executive director), while Harold Cross, administrative assistant to the executive director, hired the staff for all other parts of A&I (likewise subject to approval). Thus, whether or not OMBE is operationally part of A&I, we cannot consider it as all of a piece with the rest of the Board for purposes of evaluating the fairness of A&I's hiring procedures
 
 
 [18]
 Besides the problem of which demographic measurement best suits the case, there is disagreement as to the proper geographical area. Here, perhaps, is where a purely numerical analysis fails most visibly. There is never any ascertainable demarcation line showing from where a particular employer can or cannot draw employees. Whether a potential employee will commute or relocate to take a job depends not only on his personal tastes, but also on the types of work he does, prevailing economic conditions, the features of the two communities concerned, and any number of other factors. Moreover, the problem is inevitably complicated by the effect of the employer's own recruiting and hiring practices. See generally Hazelwood School District v. United States, 1977, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768
 In this case, the parties dispute whether the proper area is the entire state or only the Jackson Standard Metropolitan Statistical Area. The relevant figures, however, are remarkably close for both areas in nearly all important measures. The only substantial difference is that blacks make up a higher fraction of applicants for white collar jobs (professional, technical, managerial, clerical, and sales) in the Jackson area than in the state at large.
 
 
 [19]
 Actually, the defendants state that 14.9 percent of such graduates are black. Appellees' Brief at 12. This is due to the Board's misreading of the M.E.S.C. table, Plaintiffs' Exhibit 32 at table 6: what that table states is that 14.9 percent of Mississippi blacks in the labor force are high school graduates. The error becomes more serious with regard to college graduates: the Board reports that only 3.7 percent of Mississippi college graduates are black, but a little long division shows that the correct figure is 18.1 percent
 
 
 [20]
 Because the named plaintiffs all have college degrees, they lack constitutional standing to challenge the legality of A&I's educational requirements under Griggs v. Duke Power Co., 1971, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158, and Scott v. City of Anniston, 5 Cir. 1979, 597 F.2d 897, cert. denied, 446 U.S. 917, 100 S.Ct. 1850, 64 L.Ed.2d 271 (1980). See Payne v. Travenol Laboratories, Inc., 5 Cir. 1978, 565 F.2d 895, 898-99, cert. denied, 439 U.S. 835, 99 S.Ct. 118, 58 L.Ed.2d 131 (1978). Accordingly, that issue is not presented in these cases, either here or in the district court
 
 
 [21]
 To note this fact is not necessarily to find fault with A&I's procedure or job criteria. In fact, the Board's bulky set of job descriptions is about as detailed and specific as can reasonably be expected. Given the nature of A& I's work, some subjectivity in hiring is unavoidable, especially with regard to nonclerical positions. Whether necessary or not, however, subjective judgments are suspect as job qualifications when they are exercised by members of an all-white executive or supervisory staff. See Jenkins v. Caddo-Bossier Ass'n for Retarded Children, 5 Cir. 1978, 570 F.2d 1227, 1229 (per curiam)
 
 
 [22]
 This Court has consistently held that the employer bears the burden of showing his legitimate reason by a preponderance of the evidence. Burdine v. Texas Department of Community Affairs, 5 Cir. 1979, 608 F.2d 563, 567; Turner v. Texas Instruments, Inc., 5 Cir. 1977, 555 F.2d 1251, 1255; Whiting v. Jackson State University, 5 Cir. 1980, 616 F.2d 116, 121; Jefferies v. Harris County Community Action Ass'n, 5 Cir. 1980, 625 F.2d 1025, 1030. The Supreme Court has granted certiorari on the question, however. Texas Department of Community Affairs v. Burdine, 447 U.S. 920, 100 S.Ct. 3009, 65 L.Ed.2d 1112 (1980). We, of course, adhere to the Fifth Circuit rule pending the Supreme Court's decision, but it is not a matter of importance; under our view of the cases, none of the nine individual claims present turn on the applicability or nonapplicability of the Burdine rule
 
 
 [23]
 Transcript at 114, 188-89, 397-98. Usually we do not give transcript and record citations. We make an exception in this case for the convenience of this Court, should there be a petition for a rehearing en banc, and for the convenience of the Supreme Court, should there be an application for a writ of certiorari
 
 
 [24]
 Transcript at 128, 188, 345, 400
 
 
 [25]
 Transcript at 114-16, 128, 430-31
 
 
 [26]
 Record at 676-77
 
 
 [27]
 Transcript at 113, 118-19, 128-29, 144, 346-47, 362; see id. at 210, 262-63
 
 
 [28]
 Her position was, in fact, unpaid. Transcript at 224-25
 
 
 [29]
 Record at 672. The court also noted that the next person hired, Susan Hymel, was better qualified than Phillips. This is immaterial, since Turcotte testified that the hiring of Hymel was not at all connected with the rejection of Phillips. Transcript at 441
 
 
 [30]
 Transcript at 463-64
 
 
 [31]
 Defendants' Exhibit 2; see Transcript at 327
 
 
 [32]
 Transcript at 412, 415
 
 
 [33]
 Transcript at 331, 483
 
 
 [34]
 As we shall discuss later, a vacancy within the meaning of the McDonnell Douglas test does not mean only an opening existing at the precise date of application, but any opening during the time that the application remains active. The record shows that two white secretaries were hired within two months of Rice's application. Record at 185-86
 
 
 [35]
 Transcript at 178-79, 454-55; see id. at 135
 
 
 [36]
 Transcript at 452-55
 
 
 [37]
 Transcript at 72, 76, 94; Plaintiffs' Exhibit 13
 
 
 [38]
 Transcript at 72-74, 76, 94, 98. The Board handles none of its own legal work. Id. at 94-95
 
 
 [39]
 Plaintiffs' Exhibit 13; Transcript at 72, 79
 
 
 [40]
 Transcript at 74, 79
 
 
 [41]
 Transcript at 213-15
 
 
 [42]
 Record at 735. Coffman did not testify that he never interviewed Mr. Phillips, but only that he did not recall doing so. He pointed out that he interviews many applicants and easily might not remember one in particular. Transcript at 265-66
 
 
 [43]
 Plaintiffs' Exhibit 4; Transcript at 77, 96-97
 
 
 [44]
 Transcript at 227-28
 
 
 [45]
 Record at 920. The court also adverted to testimony that Robert Harrison, a black member of the Board, had approached Rice about working at the Board and that Rice had said she was not interested. It is not clear how much the court relied on that fact, but any reliance would have been misplaced. The evidence shows that, when Harrison approached Rice, she was earning more than the Board would pay. At the time of her application, by contrast, she was unemployed. Transcript at 137-40, 227
 
 
 [46]
 Plaintiffs' Exhibit 4
 
 
 [47]
 Childers's application is in the record, Record at 392, but it is not obvious that her credentials or experience exceed Rice's. She was not mentioned at trial. Through an apparent clerical error, the departure date for the person Childers replaced is plainly misreported. Record at 559, 569
 
 
 [48]
 There is at least one example on the record, occurring a few months before Rice's application, of a white applicant being hired months after applying. Plaintiffs' Exhibit 3 (Martha D'Aquino)
 
 
 [49]
 We also note that in this case, unlike the other two, there is no claim for backpay or other money relief. The complaint is expressly limited to a cause of action for injunctive and declaratory relief, and neither party introduced any evidence as to the propriety or amount of backpay awards
 
 
 [50]
 Record at 456; Transcript at 58, 145-46, 160-62
 
 
 [51]
 Transcript at 160-62, 164
 
 
 [52]
 This holding is not in conflict with Davis v. Jackson County Port Authority, 5 Cir. 1980, 611 F.2d 577, or our holding on Melvin Phillips's claim in the PEER case. In those cases the employers jumped to unwarranted conclusions while foregoing obvious opportunities to ask about them. The difference here is simply a matter of reasonableness; there is a point at which Title VII does not require an employer otherwise acting in good faith to verify every possible logical assumption on which he might rely. We are influenced in this determination by Robinson's remarkable efforts to create a position for Phillips when he found none available
 
 
 [53]
 Transcript at 72-80
 
 
 [54]
 Record at 458-59
 
 
 [55]
 Plaintiffs' Exhibit 18; Transcript at 87-88, 150-51
 
 
 [56]
 Plaintiffs' Exhibit 8
 
 
 [57]
 Plaintiffs' Exhibit 1; Transcript at 23-27, 47-48
 
 
 [58]
 Plaintiffs' Exhibit 8