**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Francisco CAICEDO–ASPRILLA, Antonio Barrios–Hoyos, Juan Calixto–Comacho, Juan Carlos Cinotto–Pantuso, Thomas Miranda–Barrios, Cristobal Fernandez–Gomez, Washington Archibald–Robinson, Guillermo Gonzales, Wilfrido Carfarzuza-Cortina, Delio Diaz-Lopez, Jaime Alvarez–Herrera, Cesar Zuniga-Lopez and Marcelo Manuel Cantera–Duyos, Defendants–Appellants.**

No. 78–5544.

United States Court of Appeals, Fifth Circuit.

Nov. 26, 1980.

Ramon Clark Calafell, Jr., Tampa, Fla. (Court–appointed), for Fernandez–Gomez.

Enrique Escarraz, III, St. Petersburg, Fla. (Court–appointed), for Archibald–Robinson.

F. Dennis Alvarez, Tampa, Fla. (Court–appointed), for Gonzales.

Anthony Alfonso, Jr., Tampa, Fla. (Court–appointed), for Carfarzuza–Cortina.

Anthony P. Prieto, Tampa, Fla. (Court–appointed), for Diaz–Lopez.

Elvin L. Martinez, Tampa, Fla. (Court–appointed), for Alvarez–Herrera.

Frederick Allen Garcia, Tampa, Fla. (Court–appointed), for Zuniga–Lopez.

Thomas M. Gonzalez, Tampa, Fla. (Court–appointed), for Caicedo–Asprilla.

Philip J. Padovano, Tallahassee, Fla. (Court–appointed), for Barrios–Hoyos.

James D. Arnold, Tampa, Fla. (Court–appointed), for Calixto–Comacho.

Frank A. Gomez, Tampa, Fla. (Court–appointed), for Cinotto–Pantuso.

Jesse V. Dominguez, Tampa, Fla. (Court–appointed), for Miranda–Barrios.

Henry Gonzalez, Tampa, Fla., for Cantera–Duyos.

John E. Lund, Asst. U. S. Atty., Tampa, Fla., for plaintiff–appellee.

Before WISDOM, TJOFLAT and REAVLEY, Circuit Judges.

TJOFLAT, Circuit Judge:

The thirteen defendants in this case appeal their convictions for conspiring to import marijuana into the United States, and for distributing marijuana with knowledge that it would be unlawfully imported into the United States. 21 U.S.C. §§ 952(a), 959(2), 963 (1976). They assert numerous grounds for reversal: (1) the trial judge was disqualified to try the case and should have recused himself; (2) the district court lacked subject matter jurisdiction; (3) the evidence is insufficient to sustain the convictions; (4) the marijuana admitted into evidence at trial was seized in violation of the defendants' fourth amendment rights and should have been suppressed; (5) tainted in–court identifications of some of the defendants violated the fifth amendment; and (6) the prosecutor improperly commented during closing argument on the failure of some of the defendants to take the stand and testify. We find no reversible error and affirm.

I

Late in the evening of April 13, 1978, the United States Coast Guard boarded a 30 foot Chris Craft power boat, the MERMAID, in the inland waters of Lee County, Florida, and discovered the residue from a cargo of marijuana. The three occupants of the boat were placed under arrest and turned over to deputies of the Lee County Sheriff's Office. One of the occupants, Jerry Lee Sylvester, confessed that he had gotten the marijuana from a mother ship located 45 to 55 miles out in the Gulf of Mexico, off the tip of Sanibel Island. The ship was described by Sylvester as being 70 to 80 feet long, with a forward cabin and a large aft hold; he described its crew as Colombian.

Ensign John Holmes, the Duty Agent at the Coast Guard Intelligence Office in Miami, was advised of the marijuana seizure, but not of the contents of Sylvester's statement to the Lee County Sheriff's Office. Holmes promptly began coordinating efforts to determine whether the power boat had acquired the marijuana from a larger vessel in the Gulf. A Coast Guard helicopter pilot flying a routine fisheries patrol spotted the ALBAZUL, a 75–foot fishing

vessel with white and blue trim, a forward cabin and large aft hold, anchored approximately 52 miles off the west coast of Florida. The vessel looked suspicious since it was not rigged for fishing, and five persons were on deck at a time when fishing boat crews normally sleep. Furthermore, the vessel flew no flag. When the pilot made two low passes in an attempt to identify it, the ALBAZUL got underway at high speed, overrunning its anchor. The pilot radioed an account of this activity to Ensign Holmes.

Ensign Holmes immediately contacted the Customs Service in Tampa and was informed of Sylvester's confession to the Lee County Sheriff's deputies. Holmes requested Customs to obtain a more detailed description of the mother ship from Sylvester. This was done and Holmes was advised that the mother ship was a fishing vessel with white and blue trim and two booms. Because this description matched the one given by the helicopter pilot, Holmes ordered the Coast Guard cutter POINT SWIFT to the area of the ALBAZUL. Meanwhile, a Coast Guard fixed wing aircraft searched a 65 by 35 mile area around the ALBAZUL and discovered no other vessel that fit its description.

At approximately 3:45 p. m. on April 14, the POINT SWIFT made visual contact with the ALBAZUL and hailed the vessel. A few minutes later, the POINT SWIFT monitored a Spanish–language radio report which, it assumed, emanated from the AL-BAZUL. The speaker indicated that the Coast Guard was following his vessel, that those aboard his vessel had been unable to move anything because of the tight surveillance, and that he had not received any instructions from the "head man" to discard anything. At 4:35 p. m. the crew of the POINT SWIFT observed items from the ALBAZUL being thrown overboard. The POINT SWIFT immediately notified the ALBAZUL that it wished to board. As the POINT SWIFT pulled alongside and as the Coast Guardsmen prepared to board, Chief Turpin detected the smell of marijuana. Once aboard, Turpin was approached by the ALBAZUL's captain, appellant Calixto–Co-

macho, who asked Turpin, "What do you want, my marijuana?" Record, vol. 5 at 151, 162. The Coast Guardsmen subsequently discovered marijuana scattered on the ALBAZUL's deck, more than 200 bales of marijuana in its hold and additional marijuana scattered in the crew's quarters.

No documentation of the ship's registry was ever found. On the cabin the word "Panama" appeared beneath the name AL-BAZUL, but another nameplate bearing "MARINER, TAMPA, FLORIDA" was discovered elsewhere.

At trial, the Government's proof indicated that the defendants were involved in a sophisticated marijuana smuggling operation. Sylvester testified that he had been given detailed plans and code names to aid him in his rendevous with the ALBAZUL and that he was to be paid $120,000 for smuggling 6000 pounds of marijuana into the West Coast of Florida. He identified appellants Calixto–Comacho and Cantera–Duyos as those in charge of the ALBAZUL; they were the ones with whom he dealt and whom he observed giving the orders to the ship's crew.

Two of the thirteen defendants, Calixto–Comacho and Diaz–Lopez, took the stand in their own defense. Calixto–Comacho testified that he was forced to participate in the venture because he owed money to those backing the smuggling operation, and they were threatening to kill his family. Diaz–Lopez, however, testified that he thought he was being hired as a crew member for a coffee freighter, and that he did not realize that the cargo was not coffee until they were at sea.

II

Appellants argue that the trial judge was disqualified to try the case and should have granted their pretrial motion for recusal. Early in the proceedings they filed motions, with supporting affidavits, pursuant to 28 U.S.C. § 144 (1976), alleging that the judge was prejudiced against anyone, especially aliens, who engaged in narcotics smuggling. They cited a comment

the judge made in a previous marijuana smuggling case to the effect that he would deal as sternly as the law would permit with those caught importing narcotics. We addressed this precise issue in *United States v. Serrano*, 607 F.2d 1145, 1149–51 (5th Cir. 1979), *cert. denied*, 445 U.S. 965, 100 S.Ct. 1655, 64 L.Ed.2d 241 (1980). There, relying on the comment cited here, the defendants claimed that this trial judge was biased and thus disqualified. We held that the judge properly denied the motions for recusal because the alleged bias was judicial rather than personal. Since the allegations presently before us suggest no different source of bias, *Serrano* controls, and we must hold that the judge's decision to proceed to trial in this case was not error.

### III

■ Appellants claim that the seizure of the ALBAZUL was in violation of a treaty between the United States and Panama, 43 Stat. 1875 (1924), and that the district court therefore lacked subject matter jurisdiction. We need not determine whether a violation of the treaty precluded the district court from exercising jurisdiction in this case. The ALBAZUL flew no flag and had no documentation indicating its registry. No evidence was ever presented to establish its claimed Panamanian registry. In short, there is no support in this record for the appellants' jurisdictional attack.

■ Appellant Zuniga–Lopez questions the district court's power to try this case on another ground. He argues that the criminal statutes under which he and the others were charged have no extraterritorial application and therefore could not reach conduct engaged in by them 50 miles out in the Gulf of Mexico. We have previously entertained this argument and have rejected it. The defendants were tried for conspiring to import marijuana and for distributing marijuana knowing that it would be unlawfully imported into the United States. Even though these acts may have occurred outside the territorial limits of the United States, they clearly had effects within United States territory, including territory over which the court below has jurisdiction. Thus, jurisdiction was proper. *United States v. Williams*, 617 F.2d 1063 (5th Cir. 1980) (en banc); *United States v. Cadena*, 585 F.2d 1252, 1257 (5th Cir. 1978); *United States v. Winter*, 509 F.2d 975, 980–89 (5th Cir. 1975).

### IV

The appellants contend that the evidence is insufficient to sustain their convictions. In evaluating this claim, we must view the evidence in the light most favorable to the Government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). The jurors' verdict will be upheld unless we can say that they, necessarily, must have entertained a reasonable doubt of the defendant's guilt. *United States v. Jackson*, 588 F.2d 1046, 1056 (5th Cir.), *cert. denied*, 442 U.S. 941, 99 S.Ct. 2882, 61 L.Ed.2d 310 (1979).

■ To prove a criminal conspiracy such as that charged in the first count of the indictment, the Government must show that there was an agreement among the conspirators to commit an offense against the United States, accompanied by an overt act by one of the conspirators in the furtherance of that agreement. *United States v. Barrera*, 547 F.2d 1250, 1256 (5th Cir. 1977). Although circumstantial evidence may be used to prove a conspiracy without ever showing the existence of any formal agreement, there must be proof beyond a reasonable doubt that a conspiracy existed, that the accused knew of it, and that he intended to join or associate himself with the objectives of the conspiracy. *United States v. Malatesta*, 590 F.2d 1379, 1381 (5th Cir.) (en banc), *cert. denied*, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979).

■ Here the evidence clearly demonstrated the conspiracy charged in the indictment. Sylvester's testimony, coupled with the tangible evidence introduced by the Government, revealed a well–planned, furtive scheme to smuggle contraband into the United States. The appellants concede that the Government produced overwhelming

evidence of a smuggling scheme, but claim that the prosecution's case was insufficient because it failed to establish that each of the defendants aboard the ALBAZUL participated in the scheme. We are satisfied that more than mere association with others involved in a criminal enterprise was shown as to every defendant in this case; there was ample proof that each defendant was aware of the ALBAZUL's smuggling mission and acted to carry that mission out. It is undisputed that all the defendants were found aboard the ALBAZUL and that the vessel was loaded with marijuana. The defendants, at the time of their arrest, had been on board approximately twelve days. Captain Calixto–Comacho testified that his codefendants had been hired to crew the 75–foot fishing vessel and had, in fact, sailed it from Columbia to the west coast of Florida. Each crewman was to be paid $1,000 for the trip, an inordinate amount for hauling coffee. Record, vol. 9 at 84, vol. 10 at 67.

The ALBAZUL was anchored off the west coast of Florida when the marijuana was offloaded onto the MERMAID. *Id.,* vol. 9 at 100. Most, if not all, of the defendants took part in the offloading. Three or four helped steady the MERMAID while several others formed a chain to pass the marijuana from the hold of the ALBAZUL onto the MERMAID. *Id.,* vol. 6 at 28, vol. 9 at 103. Although there was defense testimony that the crew's involvement was not voluntary, the jury was free to disregard it and to accept the prosecution's case, which, in our view, implicated each defendant in the conspiracy beyond a reasonable doubt. *See United States v. Cadena,* 585 F.2d 1252, 1265 (5th Cir. 1978). *See also United States v. Alfrey,* 620 F.2d 551, 555, 556 (5th Cir. 1980).

With regard to the substantive offense, distributing marijuana with knowledge that it would be unlawfully imported into the United States, the evidence showed conclusively that marijuana was brought from Columbia and distributed to Sylvester, aboard the MERMAID, for importation into this country. Some of the defendants may not have taken an active part in loading the marijuana onto the MERMAID; those who did not actively load, however, certainly aided and abetted that operation and were subject to conviction under 18 U.S.C. § 2 (1976). In sum, as to each of the defendants, the evidence was sufficient to carry the case to the jury on both counts of the indictment.

## V

Appellants argue that the Coast Guard lacked statutory authority to seize the AL-BAZUL on the high seas and that the seizure of the vessel and the search that followed violated the fourth amendment. Therefore, they argue, the marijuana introduced into evidence should have been suppressed.

Our recent en banc decision in *United States v. Williams,* 617 F.2d 1063 (5th Cir. 1980) (en banc), puts this argument to rest. In *Williams,* the Coast Guard's authority to seize and search a foreign vessel on the high seas was questioned. We held that 14 U.S.C. § 89(a) (1976) provides statutory authority for the Coast Guard to seize a foreign vessel in international waters, and to search for contraband, if there are reasonable grounds for suspecting that the vessel is violating federal narcotics laws. *Id.,* 617 F.2d at 1075–77. We then proceeded to hold that such a seizure founded on reasonable grounds would be permissible under the fourth amendment. *Id.,* 617 F.2d at 1077–1084. Thus, the ALBAZUL's seizure did not contravene the fourth amendment if the Coast Guard had reasonable grounds to suspect that the ALBAZUL was being used in the furtherance of a conspiracy to import marijuana into the United States. Reasonable grounds for suspicion were clearly present in this case.

The Coast Guard knew that the MER-MAID's source of marijuana supply was a mother ship about fifty miles out into the Gulf. The vessel Sylvester described was nearly identical to the one spotted by the Coast Guard helicopter pilot. Though a commercial fishing vessel, the boat exhibited few signs that it was engaged in fishing.

Moreover, the vessel flew no flag and attempted to avoid identification. When, as it closed on the ALBAZUL, the cutter POINT SWIFT monitored a suspicious radio broadcast and then noticed items being thrown overboard, it was quite apparent that those aboard the ALBAZUL were in violation of federal narcotics laws. The Coast Guardsmen were thus authorized to seize and board the ALBAZUL pursuant to section 89(a). When, after boarding, they encountered the strong odor of marijuana and saw it strewn about the deck, they had probable cause to search the ship, including the crew's quarters. This probable cause plainly satisfied the reasonableness standard of the fourth amendment. *United States v. Williams*, 617 F.2d at 1084–1089.

■ The appellants alternative claim—that the seizure and search of the ALBAZUL was unreasonable because it violated the United States' treaty with Panama—must be rejected on two grounds. First, as we pointed out in Part III *supra*, the appellants failed to establish that the ALBAZUL was of Panamanian registry; hence, United States–Panamanian treaty provisions are irrelevant to this case. Second, we have held that even if such a non–self–executing treaty were violated, the fourth amendment would not render the evidence seized by the Coast Guard inadmissible in a federal criminal prosecution. *United States v. Williams*, 617 F.2d at 1089.

## VI

Shortly following the defendants' arrests, Sylvester was asked to examine thirteen photographs, all of defendants, to see if he could pick out those in charge of the operations aboard the ALBAZUL. Sylvester singled out three of them. Sylvester saw the photographs a second time when he conferred with the prosecutors on the eve of trial.

Sylvester was one of the Government's prime witnesses. He had a history of drug smuggling and told how he had become involved with the ALBAZUL. Following the instructions of his accomplices ashore, Sylvester purchased the MERMAID and a CB radio and headed out into the Gulf to find the ALBAZUL. Using code names for the MERMAID and the ALBAZUL, Sylvester eventually made contact and, at 3:45 p. m. on April 12, 1978, drew alongside the mother ship. Sylvester had been given a slip of paper, called a "passport," that would indicate to the ALBAZUL that he was part of the smuggling organization and was to be trusted. Sylvester gave his passport to Calixto–Comacho, who appeared to be the ship's captain and apparently was the only one aboard who spoke English. Calixto–Comacho handed the passport to Cantera–Duyos, an older man, who checked it against a list maintained in the cabin. When Cantera–Duyos nodded affirmatively, the captain asked Sylvester how much marijuana he wanted.

The MERMAID stayed fast to the ALBAZUL for an hour and fifteen minutes. Sylvester had brought various supplies for the ALBAZUL and they were transferred to that vessel. Then Calixto–Comacho, Sylvester, Allen, and three Columbians from the ALBAZUL, all defendants, boarded the MERMAID to receive the marijuana. The marijuana was handed from the ALBAZUL's hold to several of the defendants stationed on the ALBAZUL's deck, who passed it to those on the MERMAID. After the marijuana was loaded, the MERMAID received some gasoline and departed for the west coast of Florida.

During his lengthy direct examination, Sylvester identified, without objection, Calixto–Comacho, as the ALBAZUL's captain, and Cantera–Duyos, as the individual who checked the passport. Sylvester also pointed to several of the defendants who had had occasion to come aboard the MERMAID while it was tied up to the ALBAZUL. On cross–examination, several defense counsel challenged Sylvester on his identification of their clients, pointing out that shortly following their arrests he was shown a photograph display and had singled out from it only three defendants. Despite vigorous cross–examination, Sylvester stuck by his in–court identifications.

At the close of the Government's case–in–chief, those defendants whom Sylvester had identified moved to strike his identification testimony on the ground that the two pretrial photograph displays were impermissibly suggestive and thus rendered his in–court identifications impermissibly tainted.[1]

A due process claim arises from the use of impermissibly suggestive pretrial identification procedures; such a claim may vitiate all evidence derived from those inappropriate procedures. "[D]ue process protects the accused against the introduction of evidence of, or tainted by, unreliable pretrial identifications obtained through unnecessarily suggestive procedures." *Moore v. Illinois*, 434 U.S. 220, 227, 98 S.Ct. 458, 464, 54 L.Ed.2d 424 (1977). At the core of this type of due process claim is the concern that an improper identification procedure will influence and therefore taint any subsequent identification of the same subject. The test in such situations has been enunciated as follows: "[C]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968).

It follows, therefore, that under this test objectionable testimony is that linked to the impermissible suggestion. Thus, we must stress at the outset of our due process inquiry that to be constitutionally offensive, the allegedly impermissible suggestivity must have a nexus with the purpose or probative value of the questioned testimony. A photograph display may very well be inappropriately suggestive yet not run afoul of constitutional guidelines. This is so when what it suggests is uncontested or not closely linked to the purpose or probative value of the testimony derived from the offensive procedure.

Although we find it unnecessary to reach the question of whether the photographs were inappropriately suggestive of the identity of the defendants, and thus do not rule on that matter, we shall nevertheless assume, for the sake of argument, that they were. This is the defendants' contention. *See, e. g.*, Brief for Appellant Juan Carlos Cinotto–Pantuso at 33.

It is uncontested that Sylvester off–loaded marijuana from the ALBAZUL. It is also uncontested that each of the defendants were members of the ALBAZUL's crew, were on board during the off–loading, and were found on board the ALBAZUL by the U.S. Coast Guard. If the photographs shown Sylvester suggested that the defendants were indeed the crew members of the ALBAZUL, the suggestion was harmless beyond question, as no–one has ever argued otherwise.

Sylvester's testimony was not elicited for the purpose of placing the defendants at the scene of the crime in the face of contentions that they might have been elsewhere, but rather for the purpose of recreating for the jury the roles that several of the defendants played in the crime. Record, vol. 6 at 22–28. The photograph displays were used to prepare Sylvester for this role–oriented testimony. Indeed, even appellants, in apparent self–contradiction, recognize that "the photopak presented to Sylvester was obviously intended primarily to obtain evidence for trial and *not* to identify or apprehend suspects ..." Brief for Appellant Juan Carlos Cinotto–Pantuso at 30 (emphasis added). "It is obvious that the photopak was not used to further an investigation nor to help authorities to determine the identity of the suspects." *Id.* at 28. At no point does the record indicate that the photograph display was in any sense suggestive of the particular roles that each defendant played in the event, nor do the

---

1. Appellants' briefs indicate that they may also allege error on a related ground: denial of the sixth amendment right to counsel. This claim is based upon the Government's failure to provide for defense counsel's presence at the photo displays to Sylvester. This contention is meritless. *See United States v. Ash*, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973).

appellants argue that the Government tried to influence Sylvester in his determination of who played what role during the marijuana transfer.

▮▮▮ Thus, even if the presentation of the photographs was impermissibly suggestive of what has been conceded—the identity of the defendants—it certainly was not suggestive of Sylvester's testimony. Because there is an insignificant nexus between what may have been suggested to Sylvester and the purpose and probative value of his testimony, the defendant's due process claim must be rejected.

## VII

The final point of error arises from an allegedly improper comment on the failure of some of the defendants to take the stand in their defense made by the prosecutor during closing argument. This questioned comment arose while the prosecutor was discussing the defense raised by Calixto–Comacho that he had been coerced into participation in smuggling contraband. The prosecutor pointed out to the jury that the judge would instruct them that before coercion could rise to the level of a legal defense, it must be shown that the coercion was present and immediate, that it induced a well–founded fear of death or serious bodily injury to oneself or another, and that there was no reasonable opportunity for escape. The challenged comment followed:

> And, ladies and gentlemen, you'll have that instruction. But this instruction applies only to the defendant Comacho. The instruction you get is the theory of the defendant Juan Calixto–Comacho in this case. This instruction applies only to Mr. Comacho and none of the other defendants, because none of the other defendants have established through any testimony at all that they were threatened by death or serious bodily injury.
>
> And that's the instruction you're going to get. And this instruction applies only to Mr. Comacho, and listen carefully while the Court instructs you on that.

Record, vol. 11 at 40.

Counsel for one of the defendants then objected, and the judge, noting the objec-

tion, reminded the jury that it had been instructed, and would be instructed further, that a defendant has no obligation to produce any evidence. The judge stated that he did not understand the prosecutor to suggest otherwise, but that any suggestion to the contrary in the prosecutor's remarks should be disregarded. *Id.* at 41. The prosecutor indicated his complete agreement with the court's comment.

Later, outside the presence of the jury, other defendants joined the objection. They claimed that the trial court should have granted a mistrial since the prosecutor's remarks constituted an improper comment on their clients' failure to testify. After considering counsels' arguments on the matter, the trial court denied the motion for mistrial and submitted the case to the jury. Although he considered the remark improper, he ruled that, at worst, it was an indirect reference to the election of any defendant not to testify. *Id.* at 73.

▮▮▮ Remarks about a defendant's failure to take the stand in his own defense constitute reversible error. *Griffin v. California*, 380 U.S. 609, 612, 85 S.Ct. 1229, 1232, 14 L.Ed.2d 106 (1965). In *United States v. White*, 444 F.2d 1274, 1278 (5th Cir.), *cert. denied*, 404 U.S. 949, 92 S.Ct. 300, 30 L.Ed.2d 266 (1971), this court set out the proper standard for analyzing whether comments are, in fact, remarks on a defendant's failure to testify:

> The test in determining whether such a transgression has occurred is whether the remark was manifestly intended or was "of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *Samuels v. United States*, 398 F.2d 964 (5th Cir. 1968), cert. den. 393 U.S. 1021, 89 S.Ct. 630, 21 L.Ed.2d 566 (1969).

▮▮▮ In light of the context in which the prosecutor's remarks were made, we cannot say that they were intended, or that the jury would necessarily infer that they were intended, as a comment on the defend-

ants' failure to take the stand. Although a defendant has no duty to present evidence to establish coercion as a legal defense to criminal charges, there must be some evidence in the record presenting the essential elements of that defense, with respect to each defendant seeking to rely on it, before a trial court may instruct the jury on the availability to individual defendants of that defense. *See generally United States v. Bates*, 600 F.2d 505, 511–512 (5th Cir. 1979), *United States v. Furr*, 528 F.2d 578, 580 (5th Cir. 1976). Here the trial court had properly decided that the coercion defense would be available only for Calixto–Comacho, since the evidence was insufficient to instruct the jury on the availability of that defense to the other defendants. Record, vol. 11 at 11–12.[2] The prosecutor's comment was merely emphasizing that point. We do not view his comment, taken in context and in light of the court's cautionary instruction, as directed toward the defendants' exercise of their right to remain silent.[3]

For the foregoing reasons, the convictions are AFFIRMED.

2. Diaz-Lopez's defense and apparently that of the other defendants, appeared to be that they had been "duped" into participation in the smuggling operation and that they did not participate in any overt acts after they discovered the true nature of the voyage. Record, vol. 11 at 12.

3. Appellants also allege that the prosecutor committed reversible error when, during his rebuttal closing argument, he responded to a defense counsel's argument that the prosecutor would be required to prosecute even if he were convinced that the defendants had been duped into the operation. The prosecutor then argued to the jury that charges were not brought without having a basis in fact. Appellants claim that this response suggested to the jury that the indictment carried with it a cloak of validity. No objection was raised to this comment during trial. Unless there is plain error, we cannot reverse. *Rotolo v. United States*, 404 F.2d 316, 317 (5th Cir. 1968). Here, taken in context, there clearly is no plain error.