**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James PERRY, Defendant-Appellant.**

**No. 83–2075.**

United States Court of Appeals,
Seventh Circuit.

Argued May 10, 1984.

Decided Nov. 5, 1984.

James D. O'Connell, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Alphonse C. Gonzales, Chicago, Ill., for defendant-appellant.

---

Before POSNER and COFFEY, Circuit Judges, and KELLAM, Senior District Judge.*

COFFEY, Circuit Judge.

The defendant-appellant, James Perry, appeals his conviction in the United States District Court for the Northern District of Illinois for conspiring to possess with intent to distribute and distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1), 846.[1] He was sentenced to a term of ninety days imprisonment to be followed by a three-year special parole term on the conspiracy count and three years probation on the possession count. We affirm.

## I.

According to the evidence presented at trial, in the latter part of 1982 and January of 1983, the Drug Enforcement Administration ("DEA") began an investigation into the activities of several alleged Chicago cocaine dealers. In his role as a drug dealer,[2] Special Agent Michael Vigil was introduced through undercover contacts to a Queen Esther Freeman. She in turn introduced Vigil to Robert Lewis.[3] On January 8 and 11, 1983, Vigil made several drug deals with Ruth Lewis, Robert Lewis's wife, and also arranged for the sale of 50 kilograms of cocaine at $21,000 per kilogram. $100,000 was to be paid upon delivery with the balance of $900,000 to be paid at a later time. On January 18, 1983, Vigil called Ruth Lewis and told her that he would be arriving with the cocaine the next day in a twin-engine Cessna 421 at Midway Airport in Chicago around 1:00 p.m. Vigil arrived at 1:45 p.m. on January 19, 1983 at Midway Airport with three other DEA agents who were acting as Vigil's pilots and bodyguards. The plane then taxied up to a private air service.

According to Vigil, after landing with the aircraft, he spotted Robert Lewis standing next to the defendant, James Perry. Vigil, who was wearing a recording device, approached the two men and, after an exchange of pleasantries between himself and Mr. Lewis, asked Lewis whether he had brought a car and the agreed upon money for the deal. Lewis responded that he had half of the $100,000, $8,000 cash and a $41,000 Certificate of Deposit. Lewis then stated that he would deliver the rest of the downpayment the following day, whereupon Vigil responded "Okay. I know where you live anyway." Vigil testified that during this exchange the defendant Perry was standing next to Robert Lewis, approximately two to three feet away.[4] Perry was then directed to get the car which, accord-

---

* The Honorable Richard B. Kellam, Senior District Judge of the United States District Court for the Eastern District of Virginia, is sitting by designation.

1. 21 U.S.C. § 846 states:
   "Any person who attempts or conspires to commit any offense defined in this title is punishable by imprisonment or fine or both which may not exceed the maximum punishment proscribed for the offense, the commission of which was the object of the attempt or conspiracy."
   Additionally, 21 U.S.C. § 841(a) provides:
   "Except as authorized by this title, it shall be unlawful for any person knowingly or intentionally—
   (1) to manufacture, distribute or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or
   (2) to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance."

2. This type of operation is known as a "reverse sting."

3. According to Queen Esther Freeman, Robert Lewis had become quite wealthy from his extensive drug dealings throughout the City of Chicago. At the close of the government's case, the trial court, pursuant to *United States v. Santiago*, 582 F.2d 1128 (7th Cir.1978), found that the government had established a *prima facie* case that Perry participated in the conspiracy and thus statements made by Queen Esther Freeman, which ordinarily would be considered hearsay, would be admissible.

4. The text of the approximately three-minute recorded conversation is as follows:
   S/A VIGIL: "Señor Lewis, this is the last time I come to this cold weather.
   LEWIS: "Yeah. Hey, how you doin'?
   S/A VIGIL: "Good
   LEWIS: "Okay
   S/A VIGIL: "Your car.
   LEWIS: "Yeah, I got a car. You want to bring the car in?
   S/A VIGIL: "Yeah, just bring it in.
   LEWIS: "Okay.
   S/A VIGIL: "You have the, the money?

ing to Vigil, was parked a short distance from the place of the conversation. Both Vigil and Lewis then climbed into the car. Agent Vigil sat in the front seat next to the defendant Perry. Robert Lewis, who was seated in the back seat, then passed an envelope containing the cash and the check to Vigil. Agent Vigil testified that while examining the contents of the package he noticed that the defendant Perry seemed to be surveying the vicinity around the car. At this point, Robert Lewis without announcement climbed out of the car. Agent Vigil then turned to Perry as he drove over to Vigil's plane and commenced the following conversation:

> "S.A. VIGIL: How much is the check for, $51,000? Park over there. That is my people.
> "PERRY: Which one?

LEWIS: "I got half of it. Half of it.
S/A VIGIL: "How much?
LEWIS: "I don't know. I got about fif, forty-eight thousand dollars. I got that check, my check, everything. I'll take care of it. Don't worry about it I'll bring it to you. To you, you ...
S/A VIGIL: "Okay. Okay, I know where you live anyway. Bring the car.
LEWIS: "I ain't goin' do nothin'. (unintell)
S/A VIGIL: "the only thing is a Senior....
LEWIS: "(unintell) I got to sign the check ... I got to sign the check.
S/A VIGIL: "You, you have the forty-eight and then the check.
LEWIS: "No. I got the, with the check, I got forty-eight together. I got about eight thousand dollars cash, and the check. And I would (unintell) and come down there myself I'll bring you a hundred thousand dollars.
S/A VIGIL: "You have forty eight thousand and a check.
LEWIS: "All together, with the check, I got eight thousand cash and 21, ah, 41 thousand dollars check and a eight thousand. I got (unintell)
S/A VIGIL: "Right. How much can you get the ah, how much time can you get the other 50 thousand?
LEWIS: "Oh, give me about .... How much time, how much time can you give me?
S/A VIGIL: "One day.
LEWIS: "OK, I'll pick it (unintell)
S/A VIGIL: "OK, Have him bring the car over so we can unload.
LEWIS: "Huh?
S/A VIGIL: "Have him bring the car so we can put these packages...."

Agent Vigil testified that at this point in the conversation Perry left their presence and

> "S/A VIGIL: This plane. This is my plane (unintelligible). These are my pilots from Miami. Are you going to put it in here?
> PERRY: Yeah." [The district court heard "Yeah O.K."]

Vigil then got out of the car, went to the plane, and unloaded the cocaine, part of which consisted of pseudo-cocaine. Meanwhile, Perry climbed out of the driver's side of the car, walked to the back of the station wagon, opened up the tailgate and took the cocaine shipment from Vigil. At this point, Perry and Robert Lewis, who attempted to flee from the scene after noticing the DEA agents closing in, were placed under arrest.

At the trial, the defendant Perry testified that he was 55 years of age, has been

walked over to one car parked a short distance away.

LEWIS: "Unload, uh ....
S/A VIGIL: "I got some people of mine from Miami, that are helping me.
LEWIS: "OK. I don't know them do I?
S/A VIGIL: "No. They're just ... signal to him. Get in the car with me (unintell) Let me see the money first.
LEWIS: "OK
S/A VIGIL: "Let, lets get in.
LEWIS: "Yeah".
(noise)

Lewis and Vigil then climbed into the car. Agent Vigil testified that the noise heard on the tape was Lewis, who was seated in the back seat, passing the money to Vigil, who was seated in the front seat. Lewis then unexpectedly got out of the car. Agent Vigil and Perry then drove the car over to the parked plane.

S/A VIGIL: "How much is the check for, $51,000? Park over there. That is my, people.
PERRY: "Which one?
S/A VIGIL: "This plane. This is my plane (unintell) These are my pilots from Miami. Are you going to put it in here.
PERRY: "Yeah." [The district court heard "Yeah O.K."]

At this point Agent Vigil got out of the car, retrieved the two suitcases and delivered them to Perry.

S/A VIGIL: "Help me put the suitcase. Get down with the suitcase. (Give the signal, Gary, is all right) Get, get the other suitcase.
PERRY: "Okay
S/A VIGIL: "Hurry, hurry. Hurry with the, the door. Hurry ...
UNKNOWN: "Police officer ..."

unemployed and on general assistance for the past six years, and has attempted to support himself working odd jobs. He stated that although he has known Robert Lewis for ten years and Ruth Lewis for six years, he was unaware of their involvement in the sale of drugs. He further testified that he worked for Robert Lewis over the years doing odd jobs. On the day in question, he stated that he stopped at the Lewis's house to see if Ruth Lewis had any security work for him at the club the Lewises owned.[5] It was at this time that Mr. Lewis requested that Perry accompany him to the airport. On their way to the airport, Perry recalled that he and Lewis discussed the upcoming election, baseball games, and other topics of small conversation, but did not engage in any discussion concerning drugs. Perry stated that upon arriving at the airport, Mr. Lewis climbed out of the car and walked out to meet the airplane and Vigil, but that he (Perry) waited in the car. According to Perry, Lewis and Vigil then walked over to and entered the car. Perry stated on cross-examination that even though he was present in the car during the conversation between Lewis and Vigil, the import of the conversation failed to register with him. He further stated that Vigil instructed him to drive over to the plane. According to Perry, he parked Lewis's station wagon approximately 15 to 20 feet from the plane, got out, walked around to the back of the station wagon, and attempted to open the tailgate. Perry stated that it was at this time, as he was struggling unsuccessfully to open the tailgate, he was arrested by the DEA agents. He insisted that he did not touch the suitcases containing the cocaine at any time.

Prior to Perry's trial, the other three co-defendants, Robert Lewis, Ruth Lewis, and Queen Esther Freeman, plead guilty to the various conspiracy, distribution, and possession charges. In his trial before the district court, Perry was found guilty of possession of cocaine and conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846. Perry now appeals both convictions asserting that there was insufficient evidence to support either of the convictions.

## II.

In assessing the merits of the petitioner's claims,

"[t]his court has, on numerous occasions, had the opportunity to review convictions for violation of 21 U.S.C. §§ 841(a)(1), 846. As we have previously stated, and again reiterate, when reviewing the sufficiency of the evidence to establish a conspiracy to possess with intent to distribute narcotics, we will affirm the trial court unless the evidence, viewed in the light most favorable to the government, could not have persuaded any rational trier of fact of defendant's guilt beyond a reasonable doubt."

United States v. Mayo, 721 F.2d 1084, 1087 (7th Cir.1983) (citations omitted); United States v. Moya, 721 F.2d 606, 610 (7th Cir.1983), cert. denied, —— U.S. ——, 104 S.Ct. 1312, 79 L.Ed.2d 709 (1984).[6] With this standard in mind we now turn to the defendant's conspiracy conviction under 21 U.S.C. § 846.

## A.

■ The government concurs with the appellant's position that the government

---

5. The security work supposedly involved guarding the cars parked in the lot at the Lewises' club.

6. In explaining the application of this test, we explained in Moya "that when the factfinder is asked to draw conflicting inferences from the facts in evidence in order to choose between conflicting hypotheses, the reasonable doubt test requires the reviewing court to consider the evidence according to the prosecution's inferences." Moya, 721 F.2d at 610.

The defendant suggests in his brief that "the evidence must be inconsistent with every reasonable hypothesis of innocence." Appellant's brief at 15. This novel "hypothesis of innocence" test was followed by the Fifth Circuit; however, it has not only been rejected by this circuit in our Moya decision, but also has subsequently been repudiated by the Fifth Circuit as well. See United States v. Bell, 678 F.2d 547, 549 (5th Cir.1982), aff'd on other grounds, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

must prove that James Perry knew of the conspiracy to distribute drugs and that he intended to join and associate himself with its criminal design and purpose. *See, e.g., United States v. Caicedo-Asprilla,* 632 F.2d 1161, 1166 (5th Cir.1980). The defendant's position is consistent with the basic conspiracy theory that a conspiracy "consists of a combination or confederation between two or more persons formed for the purpose of committing, by their joint efforts, a criminal act." *United States v. Mayo,* 721 F.2d 1084, 1088 (7th Cir.1983) (citations omitted). While this description implies that the co-conspirators have knowledge of the object of the agreement and intend to act in order to accomplish its unlawful end, it is equally true that given the usual clandestine nature of a conspiracy it may be established by circumstantial evidence. *Id; see also United States v. Dalzotto,* 603 F.2d 642, 645 (7th Cir.1979).

The defendant asserts that he had no knowledge of the drug transaction, and that his mere presence at the scene and his association with those involved cannot of itself support the inference that he possessed the requisite knowledge. We agree, generally, with the defendant's position that mere presence at the scene of a crime is insufficient to meet the burden of proof required to establish a conspiracy. However, as previously noted, the court heard considerable evidence concerning the existence of a conspiracy among the other three co-defendants. This evidence was provided directly through Agent Vigil who testified in the Perry trial about the drug negotiations between himself and Queen Esther Freeman and Robert and Ruth Lewis that took place prior to the cocaine delivery at Midway. Perry does not challenge the existence of this conspiracy between Freeman and the Lewises, rather he (Perry) challenges the sufficiency of the evidence linking him to the conspiracy.[7] Before reviewing the evidence in the light most favorable to the government in order to determine whether the government met its burden of

proof, we reiterate what was stated in *United States v. Roman,* 728 F.2d 846, (7th Cir.1984) (*quoting United States v. Redwine,* 715 F.2d 315 (7th Cir.1983)):

> "We are also reminded that even where the government's case is, as here, primarily circumstantial, such evidence is 'as pertinent as direct evidence to the establishment of guilt or innocence.' ... In a case hinging on circumstantial evidence, while it is important that we not permit a verdict based solely on the piling of inference upon inference, ..., it is also imperative that we not rend the fabric of evidence and examine each shred in isolation; rather, the reviewing court 'must use its experience with people and events in weighing the chances that the evidence correctly points to guilt against the possibility of innocent or ambiguous inference....' these observations are especially relevant to proof of conspiracy, the principal crime charged here. Because of the secretive character of conspiracies, direct evidence is elusive, and hence the existence and the defendant's participation can usually be established only by circumstantial evidence."

*Roman,* 728 F.2d at 858 (citations omitted). *See also United States v. Green,* 735 F.2d 1018, 1023 (7th Cir.1984).

Initially, it strikes us as incredible that Robert Lewis would have a person accompany him to a drug deal, believed by Lewis to be worth over one million dollars, where that person did not have Lewis's utmost trust and confidence. The circumstances at the airport on that day and Perry's prior relationship with Robert Lewis certainly indicate, and the factfinder was certainly entitled to infer using his God given gift of common sense, that Perry knew of the substantial drug transaction taking place. Judges in the federal system, whether they are in the trial or appellate system, do not operate in a vacuum, shielded from knowledge of drug operations in the real world of the 1980's.

---

7. *See United States v. Dalzotto,* 603 F.2d 642, 645 (7th Cir.1979); *United States v. Mancillas,* 580 F.2d 1301, 1307 (7th Cir.1978); *see also United* *States v. Xheka,* 704 F.2d 974, 988–89 (7th Cir. 1983).

Perry testified that even though he had known Mr. Lewis for over ten years and had worked for him in various capacities, he still was unaware of his extensive drug dealings. As stated earlier, we agree that mere association is certainly not enough to establish knowledge of the illicit deals; however, given Mr. Lewis's reputation for his extensive drug dealings [8] and the fact Perry was employed by Mr. Lewis on a periodic basis throughout the duration of their relationship, Mr. Perry's claimed lack of knowledge certainly casts serious doubt on his credibility. Certainly, there appears to be no other plausible explanation for Mr. Perry's presence at the privately owned airplane, (see *Mancillas*, 580 F.2d at 1308), especially where Robert Lewis, who owned the station wagon used during the drug exchange, could have transacted the drug deal without the aid of Perry if he (Perry) was not a trusted confidant and employee.[9] Also, the fact that this transaction took place at the less conspicuous Midway Airport and involved a private airplane making the delivery at a private air service certainly creates the ideal location for a million dollar drug transaction. Further, the district court, consistent with its role as the

trier of fact (*see United States v. Xheka*, 704 F.2d 974, 988 (7th Cir.1983)), obviously gave weight to the credibility of DEA Agent Vigil and his testimony regarding the location of the parties during the taped conversation where Vigil testified that Perry was present for the entire conversation, especially the early segment where the total price and down payment of $100,000 were discussed. "It is well settled law that a court of appeals does not stand in judgment of the credibility of witnesses. Rather, that question is left to the sound discretion of the trier of fact." *United States v. Roman*, 728 F.2d 846, 856 (7th Cir.1984). Finally, although Vigil and Perry did not engage in an extensive conversation in the car, in fact their exchange could be categorized as brief, the outcome of the conversation certainly indicated that Perry knew his role well in this transaction where after being directed to the airplane, Perry climbed out of the car without prior direction and opened up the back of the station wagon without any audible direction or conversation concerning the duties he was to perform much less the size of the packages.[10]

**8.** In conversations between Queen Esther Freeman and Agent Vigil regarding Robert Lewis's role, she stated that "the man has been doing his [drug dealing] for years, all his life and he don't do it himself, but he'll have a thousand suckers dealin' for him out there, you know on every main corner, he's got somebody doin' somethin'." Again, these statements were admitted into the record pursuant to the district court's *Santiago* ruling. *See supra* note 3.

**9.** On appeal the defendant suggests several innocent explanations in an attempt to refute the government's assertion that there was no rational explanation for his presence at the scene of the drug transaction. One explanation given by Perry is that he could have believed Lewis was at the airport to pickup an out-of-town visitor, while another is that the suitcases contained personal items for the admittedly lavishly decorated Lewis home. However, the fact that Lewis handed almost $50,000 to Vigil, along with Vigil's threat of "I know where you live ..." if the rest of the money was not forthcoming certainly is inconsistent with the defendant's suggested innocent explanations. Under the circumstances of this case, we are not "obligated to accept this gloss" on the defendant's actions. *See Mancillas*, 580 F.2d at 1307; *cf. Moya*, 721 F.2d at 610.

**10.** This case is similar to our decision in *United States v. Mancillas*, 580 F.2d 1301 (7th Cir.1978), where we upheld the conviction of the defendants for violations of 21 U.S.C. §§ 841(a)(1) and 846. In *Mancillas*, the defendant picked up a co-conspirator at the airport and stopped with that person at a hotel where he saw the person sign the hotel registrar under an assumed name. The co-conspirator then dropped the defendant off at his home and picked him up the following morning, whereupon both drove to a local motel. Both persons were arrested in the motel room where the drugs were exchanged. Although he was only present at the scene of the arrest and was not involved in the immediate drug exchange in the motel room, we upheld the defendant's conviction for conspiracy to distribute. There, we stated that "it was only necessary for the Government to prove and the jury to find that Lowry in some knowing way participated in the *Mancillas-Aveytia* conspiracy," *Mancillas*, 580 F.2d at 1307 (citations omitted), and that "[t]he jury could properly have concluded that there was no reason for Lowry's presence in the car or the motel room unless he was a part of the deal. Mancillas, after all, already had use of the car, and had no apparent need of Lowry to use it to go to Joliet." *Id.* at 1308.

**1171**

Perry contends, however, that our decision in *United States v. Baker*, 499 F.2d 845 (7th Cir.1974) should control the disposition of this case. In *Baker*, we reversed the conviction of a defendant where he was arrested at the scene of the drug transaction on the grounds that there was insufficient evidence to support the conviction. The evidence consisted of two separate conversations on different days relating to drug transactions between the defendant's roommate and other persons, and the defendant transporting his roommate to a motel where the drug transaction took place. *Baker*, however, can be distinguished on several grounds. First, the court in *Baker* noted that there was no evidence that the defendant participated in any of the drug transaction discussions.[11] Further, although the defendant was present at the motel room at the time of his arrest, government agents affirmatively testified that the defendant never played any part in the drug discussions or transactions. *Id.* at 847–48.

In the instant case, no such exculpatory evidence was presented by government agents testifying that the defendant did not participate in the drug transaction. When viewing the totality of the circumstances of this case, including the taped conversation and the assessment of credibility between the government agent and Perry as to their respective locations during that incriminating conversation and the fact there is no other rational explanation that explains Perry's presence and actions at the private plane at Midway Airport, there is more than sufficient evidence to affirm Perry's conviction. Thus, viewing the evidence in the light most favorable to the government, we hold that a rational trier of fact could find beyond a reasonable doubt that the government established Perry knew of and participated in the conspiracy to distribute drugs. *See Moya*, 721 F.2d at 610.

### B.

The defendant next contends that there was insufficient evidence to sustain his conviction for possession with intent to distribute in violation of 21 U.S.C. § 841(a). He asserts that since he never touched the suitcases prior to this arrest the government failed to prove actual possession. He also asserts that the government failed to prove constructive possession since it did not prove beyond a reasonable doubt that the defendant knew the contents of the packages.

Agent Vigil testified that the defendant took possession of the suitcases when the agent handed the suitcases to the defendant to be placed in the rear of the station wagon. As noted above, the defendant disputes Vigil's assertion that Perry had actual control over the suitcases; however, we need not address the issue of whether in fact actual possession occurred in this case since the evidence establishes that there was constructive possession. Earlier in this case, we held that there was sufficient evidence to support the defendant's conviction for conspiracy to distribute. To support this holding we found that there was sufficient circumstantial evidence surrounding his presence at the airport and direct evidence as to his presence during the incriminating portion of the taped conversation to support the fact that the defendant knew the contents of the packages at the time of his arrest. Thus, in order to establish constructive possession all that need be established is an intent and ability to exercise dominion and control over the package, in other words there must be some nexus between the accused and the prohibited substance. *United States v. Galiffa*, 734 F.2d 306 (7th Cir. 1984); *United States v. Mancillas*, 580 F.2d 1301, 1308–09 (7th Cir.1978). Certainly, Perry's actions in parking next to the plane, his opening up the back of the station wagon to receive the packages, and

---

**11.** In one discussion, the defendant was present in the room, however, the court noted that during this time he engaged in "small talk" with others and did not participate in the drug dealing conversations. *Baker*, 499 F.2d at 847. During the second conversation, the defendant was not in the room, but was in another room with five or six other people. *Id.* at 847–48.

the fact that those packages, if not actually in the defendant's hands, were located next to the car and in close proximity to Perry at the time of the arrest, combined with Perry's knowledge that the packages contained cocaine, supports the district court's decision finding the defendant guilty of possession with the intent to distribute.

## III.

The decision of the district court is AFFIRMED.