980 F.2d 733
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Robert BUTLER, Defendant-Appellant.
 No. 91-2307.
 United States Court of Appeals, Seventh Circuit.
 Argued Feb. 11, 1992.
Decided Dec. 4, 1992.
 
 Before CUDAHY, RIPPLE, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.
 
 ORDER
 
 1
 Robert Butler was indicted in a two-count indictment for illegal possession of an unregistered firearm in violation of 26 U.S.C. §§ 5861(d) and 5871, and possession of an interstate firearm by a convicted felon in violation of 18 U.S.C. § 922(g). A jury found him guilty on both counts. The district court sentenced him to 70 months imprisonment on each count, each to run concurrently with the other.
 
 I. BACKGROUND
 
 2
 Around 1:00 AM on February 13, 1989, Peoria Police Officer Kice answered a call and found defendant Robert Butler lying in the snow near a housing project. Because he was injured, the officer called an ambulance and went with Robert to the hospital. Robert told the officer that he and his brother had been walking together; two men came up, robbed them, and struck and shot Robert. He gave a similar account to Detective Little at the hospital. Robert underwent surgery and remained in the hospital for a week.
 
 
 3
 On the afternoon of February 13, Officer Richmond was called about a possible shooting and found the body of Robert's brother, Clifford, in Apartment 696 at 817 South Charles, near where Robert had been found.
 
 
 4
 There were interviews on other dates. On February 20, the police arrested Robert on gun charges and took his statement. He told of his possession of Clifford's sawed-off shotgun while he and Clifford were together.
 
 
 5
 On March 7, 1989, an Illinois grand jury indicted Robert for possession of a firearm on February 13, having been previously convicted of a felony. He pled guilty, and on May 22, 1990 was sentenced to 30 months probation on condition that he serve four months in a work release center.
 
 
 6
 On September 5, 1990, a federal grand jury indicted him in this case.
 
 II. SUFFICIENCY OF THE EVIDENCE
 
 7
 In a February 20 transcribed statement, Robert explained how he met Clifford and rode in Clifford's car on the night in question. Robert took possession of Clifford's single-shot shotgun with the barrel and the stock cut off. Clifford drove around a while and they argued about whether Clifford should go to the apartment where his body was later found. It was apparently a "dope house" and Clifford wanted to settle some "problems" he had there. Robert took the gun because he did not want Clifford to use it. Clifford made some attempt to regain possession. Ultimately, Clifford entered Apartment 696 and Robert followed with the shotgun in his hand. Robert was attacked by people inside, heard gun shots, and never saw Clifford after that. In the fight, Robert was forced out of the house. He was not sure whether he was inside or out when he was shot in the back. He was able to get to Clifford's car and dropped the shotgun on the passenger's side. He went to a house and asked the people to call for help, and was later picked up by the ambulance in front of their door. He explained that he had then told a different story to the police because he didn't want to get Clifford and himself into any trouble.
 
 
 8
 The statement just referred to and Robert's state court plea of guilty were ample evidence that he had possessed a firearm. In order to convict on the federal charges, the government also had to prove that the firearm was of a type required to be, but was not, registered (Count I), and that it had previously travelled in interstate or foreign commerce (Count II). At trial, the government produced a sawed-off Iver Johnson 12-gauge shotgun, and proof that it had not been registered, and had been manufactured in Massachusetts.
 
 
 9
 Defendant argues that there was insufficient evidence that the weapon introduced at trial was the one he admitted possessing during and after the time he was with Clifford.
 
 
 10
 Possession of a firearm may be proved by circumstantial evidence. United States v. Taylor, 728 F.2d 864, 868 (7th Cir.1984) (quoting United States v. Craven, 478 F.2d, 1329, 1333 (6th Cir.), cert. denied, 414 U.S. 866 (1973)).
 
 
 11
 The shotgun in evidence was consistent with Robert's description of the gun he had had while with Clifford, "a single shot shotgun with the barrel and stock cut off," Clifford's "sawed off shotgun."
 
 
 12
 Robert said that after the fight he "dropped the shotgun by on the passenger's side" of Clifford's car. Robert's other brother, Roosevelt Washington, found the car later on February 13 and found the metal portion of a gun, separated into two pieces. He stumbled onto them in the snow about seven or eight feet from the passenger's side of the car. After he took the pieces to his apartment, put them into a grocery sack, and set them on the side of a dumpster, he gave them to his sister, Lucille Washington. Lucille took them to the police.
 
 
 13
 Detective Little testified that in the early morning of February 14, Lucille brought in a brown garbage bag containing the barrel of a shotgun and a trigger mechanism housing. He filled out a property report and locked the items in the processing locker. The parts in evidence at trial looked to him in substantially the same condition as on February 14, 1989.
 
 
 14
 Officer Ganda identified the shotgun parts in evidence as those he retrieved on February 14 from the processing locker and sealed into the plastic bag. He logged these into the police property room, signed them out for examination and again in order to bring them to the trial. He testified that he had found a wooden shotgun stock outside of Apartment 696 on the afternoon of February 13, 1989. On February 14, he observed that the stock fit exactly onto the metal parts in evidence and "could see where the tape would go right onto the metal of the shotgun and then right onto this stock (indicating)."
 
 
 15
 Defendant relies on a conflict between the testimony of the Washingtons and that of government witnesses. Lucille testified that the gun in evidence was not the gun she took to the police; that the gun she took was "much longer; " and that about 12 inches of it "was hanging out of the paper bag." Detective Little testified in rebuttal that he saw nothing sticking out of the sack when Lucille brought it in and that the barrel in evidence was the same length as the one brought in. Roosevelt indicated that the barrel he found was long, although he did not know whether defense counsel's interpretation of Roosevelt's gesture, 36 or 40 inches, was correct. The barrel in evidence measured 23 inches. The jury evidently did not believe the Washingtons' testimony about the difference in length. Responsibility for assessment of credibility is left to the trier of fact. United States v. Perry, 747 F.2d 1165, 1170 (7th Cir.1984). Examining the evidence in the light most favorable to the verdict, we conclude it supports a finding that the gun introduced into evidence is the same gun possessed by the defendant.
 
 
 16
 III. SUPPRESSION OF DEFENDANT'S ORAL AND WRITTEN STATEMENTS
 
 
 17
 Prior to trial, Robert brought a motion to suppress all of his statements to police, primarily claiming lack of Miranda warnings, and a physical and mental condition at the time of questioning which prevented a knowing and understanding waiver of his rights.
 
 
 18
 Judge Mihm held an extensive hearing on two different days. He considered the circumstances of each of a number of interviews, although Robert's statements on February 20 are the most significant. With respect to the initial interviews at the hospital, the judge found that Robert was not in custody and was being questioned only as a victim at those times. He found that although Robert was experiencing pain, or on medication, the statements were not unreliable. With respect to questioning on February 16, the judge noted that the officer said he would have arrested Robert if he had tried to leave and the judge therefore considered Robert to be in custody at that time, although he had not yet been arrested. He found that Miranda warnings were given.
 
 
 19
 Robert was discharged from the hospital February 20, was immediately arrested and taken to the police station. Judge Mihm found that Robert was given Miranda warnings, made a short statement, and then asked to attend Clifford's funeral before answering further questions. This finding disposed of Robert's claim that the police coerced him into promising to answer questions as a condition of their taking him to the funeral.
 
 
 20
 After returning from the funeral and being reminded of his Miranda rights, Robert answered further questions orally. From approximately 4:30 to 6:30 PM, he responded to questions while a secretary, Rosemary McIntyre, typed the questions and answers. Robert then reviewed and signed the statement, and made several handwritten corrections. Judge Mihm found that Robert was properly advised of his rights, understood and voluntarily waived them.
 
 
 21
 Later, when jail transportation arrived, Robert said he was too weak to walk, and the police called for an ambulance. The ambulance arrived at about 9:30 PM, and its report indicates that he had been experiencing chest pains and chills for approximately one hour. The hospital admissions records indicate that he had shortness of breach, light-headedness, and had been feeling weak since about 9:00 PM. Although Robert testified that he had been feeling sick, dizzy, sleepy, and experiencing chest pains all day, the district court found that "the medical records establish that there was nothing about his condition when he went back to the hospital in the ambulance that would support the idea that he was suffering from some physical symptoms throughout the afternoon."
 
 
 22
 There was conflict in the testimony concerning Robert's condition during the afternoon. He testified to being sick and dizzy with breathing problems, was hungry and not given food, and asked to see an attorney. The officers and the secretary testified to the contrary.
 
 
 23
 Judge Mihm asked Mrs. McIntyre, "[W]hat, if anything, did the person whose statement was being taken say or do during the time that you were with him that would create any impression in your mind that he was sick or in physical distress of some sort?" She replied, "[H]e didn't do anything. I didn't even ... I wasn't aware that he had even been shot." She further testified that she did not know he had just been released from the hospital, and that there was nothing in his demeanor or appearance indicating that he was in any type of physical distress. On cross-examination, she said, "I was surprised when I had found out or heard he was shot."
 
 
 24
 Judge Mihm determined credibility and resolved the conflicts. His findings and his denial of suppression were not clearly erroneous. United States v. D'Antoni, 856 F.2d 975, 978 (7th Cir.1988). United States v. Haddon, 927 F.2d 942, 945 (7th Cir.1991). We are satisfied from our own review of the record that the statement was voluntary.
 
 IV. IMPARTIAL JURY
 
 25
 Robert further argues that his conviction should be overturned because there were no African-Americans on the jury venire. He concedes that there was no systematic exclusion of African-Americans from jury service, but asserts that the percentage of African-Americans on the jury wheel (3.1%) was below the percentage (5.3%) living in the district. The defendant has no constitutional right to a representative jury, only to an impartial jury. Holland v. Illinois, 493 U.S. 474, 480 (1990). The traditional understanding of how an impartial jury is assembled includes a representative venire, such that the jury will be drawn from a fair cross-section of the community. Id.
 
 
 26
 In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.
 
 
 27
 Duren v. Missouri, 439 U.S. 357, 364 (1979). Robert has conceded that there was no systematic exclusion of African-Americans from jury selection in the district. "Without a demonstration of such exclusion, a challenge to the venire cannot stand." United States v. McAnderson, 914 F.2d 934, 941 (7th Cir.1990). Therefore, we reject Robert's argument that the jury was not impartial because neither the jury nor the venire contained an African-American.
 
 V. DOUBLE JEOPARDY
 
 28
 Robert argues that his conviction violates the double jeopardy clause of the Fifth Amendment because he was previously convicted by the State of Illinois for the same conduct. The Supreme Court "has plainly and repeatedly stated that two identical offenses are not the 'same offence' within the meaning of the Double Jeopardy Clause if they are prosecuted by different sovereigns." Heath v. Alabama, 474 U.S. 82, 92 (1985). "In America, the powers of sovereignty are divided between the government of the Union, and those of the states. They are each sovereign, with respect to the objects committed to it, and neither sovereign, with respect to the objects committed to the other." McCullogh v. Maryland, 17 U.S. (4 Wheat.) 316, 410 (1819); see also, Abbate v. United States, 359 U.S. 187 (1959) (holding that a federal prosecution was not barred by the defendant's earlier State conviction).
 
 
 29
 It does appear from the state court transcript that Judge Eagleton considered Robert Butler's motivation for taking the gun from his brother and other circumstances he deemed mitigating. Four months of work release and 30 months of probation seemed to him a proper disposition in the light of the circumstances. We may wonder why the United States Attorney decided that federal prosecution and a substantial additional sentence was in the public interest. His decision, however, is not reviewable for a simple abuse of discretion, United States v. Giannattasio, 1992 WL 314353, 1992 U.S.App. LEXIS 28363 (7th Cir. November 2, 1992), and does not violate the guarantee against double jeopardy.
 
 VI. SENTENCING
 
 30
 Robert challenges his sentence on the ground that the district court failed to depart downward for the time he served on his state conviction. Robert was sentenced to 70 months imprisonment on each count, which was at the bottom of the guidelines range. He concedes that the range was properly calculated.[1] The district court apparently gave some consideration to the time Robert served on his state conviction in determining his federal sentence. At the sentencing hearing the district judge stated, "[T]here is no justification for any reduction in that range other than to consider the idea that you spent four months in work release and I have already indicated I feel that that's something that should be reflected in your sentence." (Tr. May 31, 1991, at 103.) Such consideration may be reflected in giving a sentence at the bottom of the guidelines range. In any event, this court does not have jurisdiction to review a district court's decision not to depart downward. United States v. Franz, 886 F.2d 973, 978 (7th Cir.1989).
 
 VII. INEFFECTIVE ASSISTANCE OF COUNSEL
 
 31
 Robert filed a supplementary pro se brief arguing that his attorney did not provide him with effective assistance of counsel in the district court. On a direct appeal, the defendant may argue that he was denied effective assistance of counsel, but the challenge is limited to deficiencies shown by the district court record. United States v. Taglia, 922 F.2d 413, 417 (7th Cir.), cert. denied, 111 S.Ct. 2040 (1991). To demonstrate a violation of the Sixth Amendment right to effective assistance of counsel, the defendant must establish (1) "that counsel's representation fell below an objective standard of reasonableness," and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 688, 694 (1984).
 
 
 32
 Robert raises several defects in his attorney's representation. First, he argues that his attorney failed to argue that probable cause for his arrest was lacking. At the hearing on the motion to suppress, the government detailed the information known to police prior to the arrest. The district court indicated that Robert's attorney had raised the absence of probable cause in his motion, but had not argued it. Judge Mihm addressed the issue anyway and concluded, "I do think that the record supports the finding that there was probable cause for his arrest at the time he was arrested."
 
 
 33
 In addition, there could be no prejudice from counsel's omission. The arresting officer testified that a witness had identified both Robert and Clifford Butler in photo lineups as the men who entered the dope house that night and had identified Robert as the man he saw carrying a shotgun underneath his coat. The same witness also stated that the shotgun in police custody appeared to be the shotgun that he saw on Robert Butler the night of the shooting. Several other witnesses had corroborated this evidence by giving descriptions of the two men and stating that at least one of them was armed with a shotgun. The officer further testified that the shotgun was said to have been found next to Clifford Butler's car and the stock of the shotgun was found by police outside the dope house. A hat with an insignia of Pearlene Cab Company, Robert's employer, was found in the dope house. Patrons of the Aqua Lounge, where Robert and Clifford were seen only moments before the shooting, had told police that they overheard the two men making remarks about "taking care of business." Thus, the arresting officer's testimony sufficiently established the existence of probable cause for Robert's arrest for illegal possession of a firearm, and Robert could not have been prejudiced by his counsel's choice not to argue this issue at the suppression hearing.
 
 
 34
 Robert points out that there was no warrant for his arrest and argues there were no exigent circumstances. Although the Supreme Court "has expressed a preference for the use of arrest warrants when feasible ... it has never invalidated an arrest supported by probable cause solely because the officers failed to secure a warrant." Gerstein v. Pugh, 420 U.S. 103, 113 (1975) (citations omitted).
 
 
 35
 Second, Robert argues that he was denied the effective assistance of counsel by his counsel's failure to locate, interview, and call certain witnesses. Robert asserts that certain witnesses present at the dope house that night had made oral and written statements to the police that they did not see him with a shotgun. He further states that his counsel was in possession of these statements before trial but failed to investigate the witnesses in any manner. The failure to investigate witnesses known to defense counsel to have made exculpatory statements to the police can, in certain circumstances, constitute ineffective assistance of counsel. Sullivan v. Fairman, 819 F.2d 1382, 1391-93 (7th Cir.1987). The defendant's challenge on this appeal, however, must be limited to deficiencies shown by the district court record. Taglia, 922 F.2d at 417. Whether or not Butler's counsel knew of such exculpatory statements by certain witnesses is not evident from the record.
 
 
 36
 Third, Robert argues that his counsel should have insisted that the jury be shown the transcript of the hearing concerning his guilty plea to the State charges along with the guilty plea itself. The transcript was admitted into evidence, but it was not shown to the jury. Robert only vaguely suggests how the transcript might have helped him. "The jury should not have been allowed to hear said evidence and testimony [his guilty plea and the factual basis therefor] without being afforded the opportunity to also review the agreement which gave rise to said guilty plea." Supplementary Brief, at 6. His counsel's choice not to show the transcript to the jury was a wise choice, however, because of the highly inculpatory statements contained therein, such as descriptions of Robert's possession of the shotgun by both the defendant, himself, and the Assistant State's Attorney. (Gov't Exh. 22)
 
 VIII. CONCLUSION
 
 37
 The judgment appealed from is AFFIRMED.
 
 
 
 [1]
 The sentences were concurrent and the same. There has been no claim that the counts should have been grouped or that grouping would have made a difference. See U.S. v. Bruder, 945 F.2d 167, 170 (7th Cir.1991), requiring grouping of the counts involved in this case